H3RKGREP

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

      v.                     16 CR 781 (RJS)

GARFIELD GREEN,

         Defendant.

------------------------------x

                                New York, N.Y.
                                March 27, 2017
                                11:30 a.m.

Before:

                 HON. RICHARD J. SULLIVAN,

                               District Judge

                     APPEARANCES

JOON H. KIM,
     Acting United States Attorney for the
     Southern District of New York
MARGARET GRAHAM
     Assistant United States Attorney

CESAR de CASTRO
     Attorney for Defendant

1          (Case called)

2          THE COURT:  Let's take appearances.

3          For the government?

4          MS. GRAHAM:  Good morning, your Honor.  Margaret

5    Graham, on behalf of the government.

6          THE COURT:  Okay, Ms. Graham.  Could you just file a

7    notice of appearance?  This case is listed as Mr. DiMase and

8    only Mr. DiMase.

9          MS. GRAHAM:  Yes, your Honor.

10         THE COURT:  So I just want to make sure you're getting

11   credit, and, also, I know who to blame if stuff doesn't happen.

12   Okay?

13         MS. GRAHAM:  Yes, your Honor.

14         THE COURT:  Great.  Thanks.

15         And for the defendant?

16         MR. de CASTRO:  For Mr. Green, Cesar de Castro.

17         THE COURT:  Good morning, Mr. de Castro.

18         And, Mr. Green, good morning to you.

19         We were, I think, all set to do this last week, and I

20   don't know what happened, there was some miscommunication, and

21   Mr. Green was not produced, but my understanding is that

22   Mr. Green wishes to plead guilty to Count Two of the indictment

23   pursuant to a plea agreement with the government.

24         Is that right?

25         MR. de CASTRO:  That's true, Judge.  If you recall the

1  other day, we scheduled this for 11:30 because I was coming

2  directly from a presentence interview.

3          THE COURT:  Yes.

4          MR. de CASTRO:  Thankfully, we did 11:30, because I

5  just ran over here.  Can I just take two more seconds?  He just

6  didn't sign the forfeiture agreement.

7          THE COURT:  Take your time.

8          MR. de CASTRO:  Then we'll be set.

9          THE COURT:  Yes.

10          (Pause)

11          MR. de CASTRO:  We're all set.  Thank you for your

12  patience, your Honor.

13          THE COURT:  All right.

14          So, Mr. Green, as I understand it, you wish to plead

15  guilty today.  Is that correct?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Well, before I accept your guilty plea,

18  I'm going to ask you some questions here in court, and the

19  purpose of my questions is, first of all, to make sure that you

20  fully understand your rights.  Okay?

21          THE DEFENDANT:  Okay.

22          THE COURT:  The second purpose of my questions is to

23  make sure that you're pleading guilty because you are guilty

24  and not for some other reason.  Now, if at any point, you don't

25  understand my questions, let me know.  I'm happy to repeat or

1  rephrase the questions, no problem there.

2         If at any point you want to talk to Mr. de Castro

3  before you answer a question, that's fine.  I'll give you as

4  much time as you need.  I don't want you to feel rushed in any

5  way.

6         THE DEFENDANT:  Okay.

7         THE COURT:  In a moment, though, I'm going to have you

8  take an oath.  I'm going to have you stand, and raise your

9  right hand, and swear that you will truthfully answer my

10  questions.  Now, once you've taken that oath, if you were to

11  make any false statements here in court, well, that would be a

12  crime.  That would be the crime of perjury.  And I tell you

13  that not to scare you, but just to make sure you understand,

14  it's vitally important that you be completely truthful and

15  thorough in all your answers to my questions.  Okay?

16         THE DEFENDANT:  Okay.  Thank you.

17         THE COURT:  Do you have any questions so far?

18         THE DEFENDANT:  No.

19         THE COURT:  No.

20         Okay.  Well, let me ask you to stand and raise your

21  right hand.

22         (Defendant sworn)

23         THE COURT:  Could you tell me your full name?

24         THE DEFENDANT:  Garfield J., as in Jamaica, Green.

25         THE COURT:  Mr. Green, how old are you?

H3RKGREP

1          THE DEFENDANT:  I'm 42.

2          THE COURT:  How far did you go in school?

3          THE DEFENDANT:  I finished high school.

4          THE COURT:  Where was that?

5          THE DEFENDANT:  In Jamaica.

6          THE COURT:  In Jamaica, the Island of Jamaica?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Okay.  Have you had any formal education

9  since then?

10          THE DEFENDANT:  No.

11          THE COURT:  You read and you write English, correct?

12          THE DEFENDANT:  Yeah.

13          THE COURT:  You obviously speak English.

14          Are you now, or have you recently been, under the care

15  of a doctor or a psychiatrist?

16          THE DEFENDANT:  I've seen a psychiatrist since I got

17  here.  Medical?  I'm diabetic and stuff like that.

18          THE COURT:  Let's break those down.

19          Let's talk about the psychiatrist.  So, since you've

20  been here, you've seen a psychiatrist?

21          THE DEFENDANT:  Yes.

22          THE COURT:  More than once or just once?

23          THE DEFENDANT:  I think once.

24          THE COURT:  Once?  Okay.

25          Did the psychiatrist prescribe any medication for you?

1          THE DEFENDANT:  No.

2          THE COURT:  Do you have plans to follow up with the

3     psychiatrist in the future?

4          THE DEFENDANT:  No.

5          THE COURT:  No?  Okay.

6          If I may ask, what was the reason for your meeting

7     with the psychiatrist when you met with him?

8          THE DEFENDANT:  That's my first time being

9     incarcerated.

10         THE COURT:  So it was part of the regular screening?

11         THE DEFENDANT:  Yeah.

12         THE COURT:  Oh, I see.  Okay.

13         But you haven't followed up with him, and you have no

14    plans to; is that correct?

15         THE DEFENDANT:  No.

16         THE COURT:  Okay.  And prior to that, prior to your

17    arrest in this case, have you had any kind of psychiatric

18    treatment, or seen a psychologist, or anything like that?

19         THE DEFENDANT:  Like here -- when I lost my leg.

20         THE COURT:  When you lost?

21         THE DEFENDANT:  My leg.

22         THE COURT:  Your leg?

23         THE DEFENDANT:  Yes.

24         THE COURT:  When was that?

25         THE DEFENDANT:  I think late '91.

H3RKGREP

1          THE COURT:  Okay.  And when was the last time you saw

2     a psychiatrist or a psychologist prior -- other than the prison

3     doctor?

4          THE DEFENDANT:  That's it.

5          THE COURT:  That was it?

6          THE DEFENDANT:  When I lost my leg.

7          THE COURT:  You also said that you've got some other

8     health issues.  And you mentioned diabetes; is that right?

9          THE DEFENDANT:  Yes.

10         THE COURT:  Do you take medication for diabetes?

11         THE DEFENDANT:  Yeah.  Insulin.

12         THE COURT:  How often do you take insulin?

13         THE DEFENDANT:  Two times a day.

14         THE COURT:  That's by injection?

15         THE DEFENDANT:  Yes.

16         THE COURT:  Does the insulin affect your judgment, or

17    your memory, or your ability to think clearly at all?

18         THE DEFENDANT:  No, it doesn't.  Just like probably

19    lowers sometimes, and if I don't take it, I get phantom pain.

20         THE COURT:  Are you taking other medications besides

21    insulin?

22         THE DEPUTY CLERK:  Metformin.

23         And I used to take painkillers for the phantom pain,

24    but I stopped taking it.

25         THE COURT:  Because of your leg?

1          THE DEFENDANT:  Yes.

2          THE COURT:  When was the last time you took medication

3     for that?

4          THE DEFENDANT:  Probably a month ago.

5          THE COURT:  A month ago?  Okay.

6          In the past two days, have you taken any medication

7     besides insulin?

8          THE DEFENDANT:  No.

9          THE COURT:  In the past two days, have you drunk any

10    alcohol or taken any drugs of any kind?

11         THE DEFENDANT:  No, never.

12         THE COURT:  Okay.  Is your mind clear today?

13         THE DEFENDANT:  Yeah.

14         THE COURT:  Do you understand the nature of this

15    proceeding and what's taking place here today?

16         THE DEFENDANT:  I do, Judge.

17         THE COURT:  Mr. de Castro, do you have any doubt as to

18    Mr. Green's mental competence or his ability to enter an

19    informed plea?

20         MR. de CASTRO:  I have no doubts.

21         THE COURT:  And, Ms. Graham, do you have any such

22    doubts?

23         MS. GRAHAM:  No, your Honor.

24         THE COURT:  All right.  Neither do I.  I don't know

25    Mr. Green well, but on the occasions that I have seen him, he

1  has struck me as very coherent, and intelligent, and aware of

2  what's going on.  His responses to my questions here today

3  confirm that impression.  And that, coupled with the statements

4  of the lawyers, leads me to conclude that Mr. Green is fully

5  competent to proceed with a guilty plea at this time.

6          So, Mr. Green, as I understand it, you wish to plead

7  guilty to Count Two of the indictment in this case; is that

8  correct?

9          THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  Do you feel you have had enough time to

11  discuss this case with your attorney, Mr. de Castro?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  And you have had enough chance to discuss

14  with him any possible defenses that you may have to the charges

15  contained in this indictment?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  Yes?  Okay.

18          Are you satisfied with Mr. de Castro's representation

19  of you?

20          THE DEFENDANT:  Yes, I do.

21          THE COURT:  Okay.  Well, what I want to do now is go

22  over with you some rights that you have as a defendant in a

23  criminal case, and I usually do that in two ways.  One is by

24  reviewing a document that you, hopefully, have seen called an

25  Advice of Rights Form.

1           Do you have that, Mr. de Castro?

2           MR. de CASTRO:  Yes.  It's in front of him, Judge.

3           THE COURT:  Great.  Okay.

4           If you turn to the second page of that document,

5    Mr. Green, there's a signature page, there are some signatures

6    at the bottom of the page.  Is one of those signatures yours?

7           THE DEFENDANT:  Yes, it is.

8           THE COURT:  And before you signed that document, did

9    you read it?

10          THE DEFENDANT:  Yes, I did.

11          THE COURT:  And you had a chance to discuss it with

12   Mr. de Castro before you signed?

13          THE DEFENDANT:  Yes, I did, your Honor.

14          THE COURT:  And he was able to answer any questions

15   you may have had about that document or the rights described in

16   that document?

17          THE DEFENDANT:  Yes, he did.

18          THE COURT:  And, Mr. de Castro, is that your signature

19   as well?

20          MR. de CASTRO:  Yes, it is.

21          THE COURT:  And before you signed it, you reviewed it

22   with your client?

23          MR. de CASTRO:  Yes.  I reviewed it with him last week

24   as well as again today.

25          THE COURT:  Okay.  Great.

1        If you could hand that up, I'll mark it as a court

2   exhibit.  I'll mark it as Court Exhibit 1.  I'll date and

3   initial it.

4        But in addition to this document, Mr. Green, I'm going

5   to ask you some questions here in court that cover a lot of the

6   same ground.  I do that because these rights are so important,

7   and your understanding of them is so essential, that I don't

8   want to leave anything to chance.

9        THE DEFENDANT:  All right.

10        THE COURT:  So, as we go through these rights, if you

11   have any questions about them, let me know.

12        THE DEFENDANT:  Okay.

13        THE COURT:  We're not in a hurry, we have plenty of

14   time.  We want do this very carefully and very thoughtfully.

15   Okay?

16        THE DEFENDANT:  Okay.  Thanks.

17        THE COURT:  So, the first right that I want to go over

18   with you is your right to a speedy and public trial by a jury

19   on the charges contained in this indictment.  Do you understand

20   that you have that right?

21        THE DEFENDANT:  Yes, I do.

22        THE COURT:  So, if there were a trial, the government

23   would have the burden of proving that you were guilty beyond a

24   reasonable doubt -- that would be the standard, beyond a

25   reasonable doubt -- by competent evidence before you could be

1  found guilty.  Do you understand that?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  A jury of 12 citizens would have to agree

4  unanimously that you were guilty beyond a reasonable doubt

5  before you could be found guilty at trial.  Do you understand

6  that?

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  You would not have to prove that you were

9  innocent if you went to trial.  Do you understand that?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  You wouldn't have to prove anything.  You

12  could sit quietly and do nothing.  The burden would always be

13  on the government to prove that you were guilty beyond a

14  reasonable doubt.  Do you understand that?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  Now, in this case, and at every stage of

17  this case, at all proceedings involved in this case, you are

18  entitled to have an attorney, and if you couldn't afford an

19  attorney, one would be appointed for you at no cost to you.  Do

20  you understand that?

21          THE DEFENDANT:  Yes, your Honor.

22          THE COURT:  And, so, in this case, Mr. de Castro has

23  been appointed to represent you; is that correct?

24          THE DEFENDANT:  Yeah.

25          THE COURT:  So, you're not paying him to be here,

1  right?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  And that's because Mr. de Castro is one of

4  a group of lawyers that the Court has approved to represent

5  individuals who can't otherwise afford an attorney.  We're very

6  fortunate.  We have a lot of fantastic lawyers who are willing

7  to do that work, and, in fact, we have to turn people away.

8  And so, Mr. de Castro has been on that list for a long time.

9          How long have you been on it, Mr. de Castro?

10         MR. de CASTRO:  Going on, I think, seven, eight years,

11 maybe.

12         THE COURT:  Okay.  So he's a very experienced lawyer

13 who knows his way around federal court, and he's here to

14 represent you at trial, or if you wish to plead guilty, then,

15 obviously, we'll do that, but the point is, he's here to

16 represent you no matter what.  Do you understand that?

17         THE DEFENDANT:  Yes, I do.

18         THE COURT:  Now, if there were a trial in this case,

19 the government would have to have its witnesses come into

20 court, and they'd have to testify here in your presence.  Do

21 you understand that?

22         THE DEFENDANT:  Yes, your Honor.

23         THE COURT:  That's because you have the right to

24 confront your accusers.  That's what the Constitution says.

25 And so that means that all the witnesses for the government

1    would have to come and testify right here, in this witness box,

2    if there were a trial.  Do you understand that?

3              THE DEFENDANT:  Yes, your Honor.

4              THE COURT:  And that way, you would be able to see

5    them and to hear them as they testify.  You'd also have the

6    right to have your attorney cross-examine those witnesses, to

7    ask them questions, to see whether they knew what they were

8    talking about, whether they were lying, whether they were

9    perhaps mistaken.  All of those things your lawyer could do by

10   asking questions.

11             Do you understand that?

12             THE DEFENDANT:  Yes, your Honor.

13             THE COURT:  Your lawyer, Mr. de Castro, if there were

14   a trial, could also object to the government's evidence if he

15   thought there was some legitimate reason to keep the evidence

16   out of the trial.  Do you understand that?

17             THE DEFENDANT:  Yes, your Honor.

18             THE COURT:  Now, you yourself could call witnesses,

19   and you could present evidence if you wanted to.  Do you

20   understand that?

21             THE DEFENDANT:  Yes, your Honor.

22             THE COURT:  You'd have the right to do that.  You

23   wouldn't have to.  As I said before, you have no obligation to

24   do anything.  But if you wanted to put on a case, and call

25   witnesses and introduce evidence, that would be your right.  Do

1  you understand that?

2           THE DEFENDANT:  Yes, your Honor.

3           THE COURT:  Now, if there were witnesses that you

4  wanted to call, you wanted them to come to court and testify on

5  your behalf, and they said, not a chance, I'm not coming to

6  court, I don't want to be in court, I won't go, well, that

7  wouldn't be the end of the story, because you could have

8  subpoenas issued or other process used to compel those people

9  to come to court and to testify truthfully under oath.

10          Do you understand that?

11          THE DEFENDANT:  Yes, your Honor.

12          THE COURT:  You yourself could testify at trial if you

13 wanted to.  Do you understand that?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  You'd have the right to get up here and

16 testify just like any other witness.  But you'd also have the

17 right not to testify, and if you chose not to testify, the jury

18 couldn't attach any significance to that fact.  They couldn't

19 say, well, this guy Green must be guilty because an innocent

20 person would have gotten up here and told us his side of the

21 story, and since he didn't do that, well, we know he must be

22 guilty.  They're not allowed to do that.  And so I would tell

23 the jury, as I do at every trial, both at the beginning of the

24 trial and again at the end of the trial, I would remind them

25 that the defendant is presumed innocent.  I would remind them

H3RKGREP

1  that the burden of proof is on the government, and I would

2  remind them that if the defendant chooses not to testify, you,

3  the jury, I would say, can't hold that against him, you can't

4  treat that as evidence as it's not evidence of anything.

5          Do you understand that?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  Now, if the jury returned a guilty verdict

8  against you at trial, you then would have the right to appeal

9  the jury's verdict.  Do you understand that?

10         THE DEFENDANT:  Yes, your Honor.

11         THE COURT:  And that means that you could go to the

12 Court of Appeals, which sits upstairs in this building, and you

13 could challenge the jury's verdict or my rulings, and you could

14 ask the Court of Appeals to either overturn the jury's guilty

15 verdict or to give you a new trial perhaps.  You'd have the

16 right to appeal.  Do you understand that?

17         THE DEFENDANT:  Yes, your Honor.

18         THE COURT:  Even now, Mr. Green, as you're getting

19 ready to enter a guilty plea, you have the right to change your

20 mind.  Do you understand that?

21         THE DEFENDANT:  Yes, your Honor.

22         THE COURT:  We haven't yet crossed the point of no

23 return.  We're getting pretty close, but if you told me right

24 now, hey, I've changed my mind, I'd like to go to trial, that

25 would be okay, I wouldn't be mad at you, Mr. de Castro wouldn't

1    be mad at you, Ms. Graham wouldn't be mad at you.  We all

2    understand this is your decision, and if you wish to go to

3    trial, we respect that, and we'll go to trial.  I think we have

4    a date already.  So, that's an option.  If that's what you'd

5    like to do, we can to that.

6              Do you understand that?

7              THE DEFENDANT:  Yes, your Honor.

8              THE COURT:  Do you still want to go forward with a

9    guilty plea today?

10             THE DEFENDANT:  Yes, your Honor.

11             THE COURT:  Do you understand that if you plead

12   guilty, and if I accept your guilty plea today, that means that

13   there will be no trial in this case?  Do you understand that?

14             THE DEFENDANT:  Yes, your Honor.

15             THE COURT:  By pleading guilty today, you will have

16   given up your right to a trial and all the other rights that I

17   just mentioned.  Do you understand that?

18             THE DEFENDANT:  Yes, your Honor.

19             THE COURT:  I guess the only exceptions to that are

20   your right to counsel will continue.  Mr. de Castro will

21   continue to represent you even if you plead guilty today, so

22   you won't give up that right.

23             And you may also have the right to an appeal, though

24   the reality is that once you plead guilty, and once I accept

25   your guilty plea, it would be very difficult for you to appeal

1  and say, hey, I didn't do the things that I admitted to doing

2  in court.  Do you understand that?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  Okay.  Now, you should also understand

5  that as a result of your guilty plea, that means that you will

6  be sentenced.  Not today, but ultimately you will be sentenced

7  on the basis of the crime that you pled guilty to.  Do you

8  understand that?

9          THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  And you should also understand that by

11  pleading guilty -- or let me put it this way:  Before I accept

12  your guilty plea, I'm going to ask you to tell me what it is

13  you did that makes you guilty of this crime.  The reason I do

14  that is, I want to be very sure that you're pleading guilty

15  because you are guilty and not for some other reason.  But in

16  asking you to tell me what you did that makes you guilty of the

17  crime, I'm also asking you to give up another very important

18  right, and that's your right not to incriminate yourself.  As I

19  said before, nobody can make you testify, nobody can make you

20  speak to the government or even here in court, but if you want

21  to plead guilty, I'm going to need you to tell me what you did

22  so that I can be confident that you're pleading guilty for the

23  right reasons.

24          Okay?  Are you prepared to do that?

25          THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  Okay.  All right.

2          So let's talk a little bit about the charges in this

3     case and the plea agreement.  So, you've seen a copy of the

4     indictment in this case?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  The indictment has two counts, but in this

7     case, we're really going to be focused on the second count,

8     which charges you with robbery.  It's sometimes referred to as

9     Hobbs Act, and Hobbs is just the name of the statute, the bill

10    that became a law.  It's a Hobbs Act robbery, and that means

11    it's a federal robbery, a robbery that took place that affected

12    interstate commerce.  That's what makes it a federal crime as

13    opposed to a state crime.  So, that's what you've been charged

14    with, and that's a crime that's in violation of a statute that

15    was passed by Congress and signed by the president a long time

16    ago, and if you looked to find it in the law books, it's Title

17    18 of the United States Code, Section 1951 and Section 2, also.

18    So, that's what you have been charged with.

19          Do you understand that?

20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  Now, every crime is made up of what are

22    called elements.  The elements are just kind of requirements.

23    They're the building blocks of the offense.  So, before you can

24    be found guilty of this crime, the government would have to

25    prove each and every one of the elements of the crime beyond a

1    reasonable doubt.

2           So, the elements -- they can sound a little technical,

3    but they're straightforward.  These are the things I'd be

4    asking the jury to consider and determine at trial, and these

5    are the things that I will be considering today before I accept

6    the guilty plea.  They're called the elements, and I want you

7    to listen carefully as I state what these elements are.

8           Actually, I'll let Ms. Graham do something, so she's

9    going to tell us what the elements of this crime are.  I want

10   you to listen carefully to her.  When she's finished, if you

11   have any questions about these elements, let me know, and we

12   can chat about it.

13          Okay.  Ms. Graham.

14          MS. GRAHAM:  This crime has three elements:  First,

15   that the defendant knowingly obtained or took the personal

16   property of another or from the presence of another; second,

17   that the defendant took this property against the victim's will

18   by actual or threatened force, violence or fear of injury,

19   whether immediately or in the future; and, third, that as a

20   result of the defendant's actions, interstate commerce or an

21   item moving in interstate commerce was delayed, obstructed, or

22   affected in any way or degree.

23          THE COURT:  Okay.  So, it sounds a little technical,

24   but it's basically pretty straightforward.  Do you have any

25   questions about what Ms. Graham just said?  Do you understand?

H3RKGREP

1    Do you want me --

2              THE DEFENDANT:  I don't understand.

3              THE COURT:  You don't understand.  Okay.

4              So, basically, to be found guilty of this crime, you

5    have to have used or attempted to use force in order to take

6    property from the person of another, and that force and that

7    robbery has to have had an impact on interstate commerce.  So,

8    if you robbed a drug dealer, well, that would automatically

9    affect interstate commerce because the drug trade affects the

10   national economy, interstate economy.  If you rob somebody as

11   they were driving from one place to another or they were

12   engaged in business that involved more than one state, that

13   would be enough to affect interstate commerce.

14             Now, you don't have to have known about the interstate

15   commerce part, but the government would have to prove that the

16   robbery had an effect or could have an effect on interstate

17   commerce.  Okay?

18             THE DEFENDANT:  Right.

19             THE COURT:  And you have to have understood -- but you

20   would have to have understood that what you were doing was

21   wrong and illegal.  You don't have to know the specific

22   statute, but you had to have a sense at the time you were doing

23   it that this was not allowed.  So, those are the elements.

24   Okay?

25             THE DEFENDANT:  I understand.

H3RKGREP

1        THE COURT:  I want you to ask me questions if you're

2     not sure of anything.

3        Now, one other thing the government would have to

4     establish, if this case went to trial, is that some part of

5     this crime took place here in this district.  This district is

6     the Southern District of New York, and the Southern District of

7     New York is comprised of Manhattan, the Bronx, Westchester,

8     Rockland, Dutchess, Putnam, a few other counties up there.  So,

9     some part of this crime would have to have taken place in this

10    district for you to be found guilty.  If it all took place in

11    California, you couldn't be found guilty here.

12       However, this requirement, which is sometimes referred

13    to as venue, doesn't have to be proven beyond a reasonable

14    doubt, the way the other elements do.  This venue requirement

15    would simply have to be proven by what's called a preponderance

16    of the evidence, which is a much lower standard, just the

17    greater weight of the evidence would be enough.  Beyond a

18    reasonable doubt would mean the scales of justice would have to

19    just really be imbalanced, but preponderance is just ever so

20    slightly in favor of proving that something happened here.

21       Now, in this cases, it sounds like you have agreed

22    that you would waive the venue requirement, and that's allowed.

23    So, if everything took place outside of this district, it all

24    took place in New Jersey, perhaps, or in Queens, you could

25    still be prosecuted here if you agree to waive this venue

1    requirement, and so that is my understanding, is that perhaps

2    that's what you've contemplated here.  We'll talk more about

3    that, but those are the elements, and that's venue.

4         Do you have any questions about those things?

5         THE DEFENDANT:  No.  Thanks.

6         THE COURT:  Okay.  Good.

7         So let me tell you a little bit about the penalties

8    that you face for this crime.  This crime carries a maximum

9    term of imprisonment of 20 years.  It also carries a maximum

10   term of supervised release of three years, which means that

11   after you finished serving your prison term, you would be

12   released, you'd come home, but you'd still be supervised by the

13   probation office for up to three years.  And that supervision

14   would also carry with it certain terms and conditions that

15   you'd have to comply with.  So that's what supervised release

16   is.

17        In addition, this crime also carries a maximum fine of

18   the greatest of either $250,000, twice the gross gain,

19   financial gain, that was derived from this crime, or twice the

20   gross loss that was experienced by someone else besides

21   yourself as a result of this crime.  So, whichever of those

22   three options is the greatest, that's the maximum fine.

23        In addition, I can also order that you pay restitution

24   to any person or entity that was harmed.  So, if somebody got

25   shot, for example, or somebody got injured, I could order you

1    to pay that person to help compensate them for those injuries.

2    And that's separate from a fine.

3            I can also order you to forfeit any of the property or

4    the proceeds that were derived from this crime.  So, whatever

5    money you made or whatever money was made off of this crime, I

6    could order you to pay it back, even if you don't have it still

7    or even if it didn't all come to you, some of it went to

8    coconspirators.  The goal of this forfeiture is to make sure

9    that people don't profit from crime, and so that's also part of

10   a possible sentence.

11           I can also order you to forfeit any property that was

12   used to carry out the crime.  So, for example, if you engaged

13   in this robbery, and you used a car for some part of the crime,

14   I could order you to forfeit the car because the car was used

15   to carry out the crime, and, therefore, it can be taken from

16   you as part of forfeiture.

17           Finally, there is a $100 special assessment that's

18   mandatory that has to be paid, and that's, again, separate from

19   any fine or any restitution or any forfeiture.  The special

20   assessment is designed to help cover the costs of the court --

21           THE DEFENDANT:  All right.

22           THE COURT:  -- of court reporters, and marshals, and

23   law clerks, and judges, and all the things that are required to

24   keep a system of justice running.  Okay?

25           THE DEFENDANT:  Okay.

1          THE COURT:  So, those are the maximum penalties.

2          Do you have any questions about any of those?

3          THE DEFENDANT:  No, your Honor.

4          THE COURT:  Are you a United States citizen?

5          THE DEFENDANT:  I'm sorry?

6          THE COURT:  Are you a United States citizen?

7          THE DEFENDANT:  No, I'm not.

8          THE COURT:  You're not?

9          So, you should understand that as a consequence of

10   your guilty plea, it is at least possible, perhaps even likely,

11   that you would be deported back to -- is Jamaica your nation of

12   citizenship?

13         THE DEFENDANT:  Yeah.

14         THE COURT:  So it's possible that you would be

15   deported back to Jamaica as a result of this crime.  Do you

16   understand that?

17         THE DEFENDANT:  Yes, I do.

18         THE COURT:  You do understand that?

19         That won't be up to me.

20         THE INTERPRETER:  Right.

21         THE COURT:  That will be up to the executive branch,

22   the Department of Homeland Security will decide that.  And

23   there might be things you can do to challenge that that won't

24   be decided by me, but that there's at least a good chance that

25   you would be deported as a result of this conviction, and I

1  want to make sure that you understand that.

2           So, you do understand that?

3           THE DEFENDANT:  Yes.

4           THE COURT:  Okay.  I mentioned before that there is

5  supervised release that's part of this crime, and the way

6  supervised release works is that if you were to violate any of

7  the terms and conditions of your supervised release, I could

8  then resentence you to jail, I could send you back to jail for

9  up to three years.  Do you understand that?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  You wouldn't get credit for any of the

12 time you'd already spent on supervised release.  So, if you're

13 on for two years and doing great, and then in the last year of

14 a three-year term, you committed another crime, or you used

15 drugs, or possessed a gun or something, I could then say,

16 that's it, I'm revoking supervised release, and I'm sending you

17 back to jail for three years, and you wouldn't get credit for

18 the two years you'd already spent on supervised release.

19          Do you understand that?

20          THE DEFENDANT:  Yes, your Honor.

21          Is supervised release allowing me go to work, though?

22          THE COURT:  Oh, yes, supervised release would

23 typically be that you would be home, and working, and living,

24 and with your family.

25          THE DEFENDANT:  Okay.

1      THE COURT:  Now, because you might be deported, it

2  might be that supervised release is not really going to apply,

3  I don't know, but certainly supervised release is part of a

4  sentence that I could impose.  And even if you're deported,

5  then if you ever returned, you'd have to immediately report to

6  the probation office.  Okay?

7      THE DEFENDANT:  Yes, sir.

8      THE COURT:  Now, I should also mention to you that

9  there's no parole in the federal system.  New York State, New

10  Jersey, some other states have parole.  Jamaica may, too, other

11  countries have parole, and the way parole works is that the

12  judge might impose a particular sentence on the day of

13  sentencing, but later, while the person was serving the

14  sentence, the parole board might decide, okay, this person is

15  ready to go home sooner than what the judge imposed, maybe

16  half, maybe a third.  Different states do it different ways.

17  That's not part of the federal system.  This is federal court,

18  and, here, whatever sentence I impose on you, that is the

19  sentence that you will serve.

20      Do you understand that?

21      THE DEFENDANT:  Yes, your Honor.

22      THE COURT:  The only exception is that you could get a

23  certain amount of time off, a small amount of time off, for

24  good behavior, but that amount of time off could not be more

25  than 15 percent of the total sentence.  So, that's the maximum

1  amount reduction, would be 15 percent.  And the decision as to

2  whether you demonstrated good behavior, that would be up to the

3  Bureau of Prisons, it wouldn't be up to me.  But, otherwise,

4  you'd have to serve the whole sentence that I impose.

5          Do you understand that?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  Now, are you serving any other sentence at

8  this point, state, federal, or any other sentence any place

9  else?

10          THE DEFENDANT:  No, your Honor.

11          THE COURT:  Now, a couple of other things about

12  sentencing that I want to make sure you understand.

13          First of all, the decision as to what you will receive

14  is up to me and nobody else.

15          THE DEFENDANT:  Okay.

16          THE COURT:  So, no matter what anybody else has told

17  you -- whether it's your lawyer, or the government, or anybody

18  else -- I'm not bound by that.  As I sit here now, I don't know

19  what sentence I will impose, but I'm the only one who

20  ultimately will decide that question.  So, to the extent

21  anybody has told you what I am likely to do, don't count on

22  that.  They don't know what they're talking about because I'm

23  the only one who knows, and I'm the only one who has authority

24  to decide.  Okay?

25          THE DEFENDANT:  Okay.

1          THE COURT:  Now, there are certain factors that I'm

2     required to consider when I decide what's an appropriate

3     sentence.  I want to just let you know what those factors are,

4     so you have a sense as to how the process works.  As I said,

5     I'm not going to sentence you today, I'm going to sentence you

6     a few months from now, when I have more information, but among

7     the things I will carefully consider in deciding what's an

8     appropriate sentence is, first of all, your own personal

9     history.

10          THE DEFENDANT:  Okay.

11          THE COURT:  So I'm going to make sure that the

12     sentence I impose is tailored to you as a person.  That means

13     looking at your entire life, from your birth right up until

14     now.  And I will consider the circumstances of your birth --

15     were you born into tough economic circumstances, did you have a

16     strong family structure or a weak family structure, did you

17     have opportunities for education, do you have a work history of

18     working legitimate jobs, do you have a prior criminal

19     history -- because all of that is relevant to determining

20     what's an appropriate sentence.  Your family circumstances

21     today, all of that is relevant.  I'll look at all of that,

22     because the sentence is not just about the crime, it's also

23     about you.  So I'm going to look at the entire experience that

24     you have had right up until now.

25          Now, another factor that I have to consider involves

1    the facts and circumstances of this crime.  This is obviously a

2    pretty serious crime.  And so the sentence I impose has to

3    reflect the seriousness of the crime.  It has to promote

4    respect for the law.  It also has to provide a just punishment

5    for this crime.  So, that requires me to look at what exactly

6    went on here, not just what the crime is called, but what

7    exactly happened, what you did, what others did, what harm was

8    caused, how much money was made, did this go on over a long

9    period of time, was it a short thing.  All of that matters in

10   deciding what's an appropriate sentence.  And so that's another

11   factor that I will consider.

12         A third factor that I will consider is the need to

13   deter or discourage you and others from committing crimes like

14   this in the future.  That's the hope, that by imposing a

15   sentence on you in this case, I will send a message to you, and

16   perhaps to other people, and that that message will encourage

17   you to change your behavior, that it will have an impact on

18   your future behavior and the future behavior of other people.

19         Now, I don't have a crystal ball, so it's hard for me

20   to know with certainty what impact my sentence will have on

21   anybody's future behavior, but I have to use my best judgment.

22   I have to say, well, I think a sentence of this long is likely

23   to send the message, and hopefully that message will sink in

24   and will affect the way you conduct yourself in the future and

25   the way potentially other people will conduct themselves in the

1   future.  So, that's the hope, and that's another factor that I

2   have to consider.

3           Another factor that I have to consider involves your

4   own needs while you're in custody.  So, obviously, you have

5   some serious health issues, which a lot of defendants don't

6   have.  I have to make sure that those issues are addressed.

7   Not everybody has health issues.  Some people have substance

8   abuse treatment issues or mental health treatment needs.  Some,

9   frankly, just have the need for job training or educational

10  opportunities.  So I have to look at very carefully to see what

11  your needs are and to make sure those needs are met and

12  addressed while you're in custody.  So, that's another factor I

13  have to consider.

14          Another factor that I have to consider -- there are a

15  lot of factors, as you can probably tell -- but another factor

16  is something called the United States Sentencing Guidelines.

17  Are you familiar with the sentencing guidelines?  Have you

18  heard of those before, Mr. Green?

19          THE DEFENDANT:  Not really.

20          THE COURT:  You know, I have a hunch you probably did.

21  Mr. de Castro has probably --

22          THE DEFENDANT:  Oh, yeah.  Sorry, sorry, sorry.

23          THE COURT:  Oh, no, no.

24          THE DEFENDANT:  Sorry, he did told me.

25          THE COURT:  That's okay.  Look, today is an important

1    day in your life, and it's a little stressful.  Probably I'm

2    asking you a lot of questions, and, you know, you're hearing

3    some of it, and some of it, you may not be hearing.  That's why

4    I go slow.  That's why I make sure if you have any questions,

5    you get to ask them.  And it's why I'm watching and paying

6    attention, right, I'm looking to see if you're hesitating, or

7    if you look confused, then I know, well, maybe there's a need

8    for a follow-up.

9         So, that's why we do it this way.  We want to be

10   really careful.  So I have a feeling Mr. de Castro probably

11   told you something about this because I know he's a very

12   thorough lawyer, but whether he did or he didn't, I always

13   explain a little bit about how the guidelines work, just for

14   you and then for family members, too.  Okay?

15        THE DEFENDANT:  All right.

16        THE COURT:  So, the guidelines are a big book, and

17   there's a version that gets sent out every year.  Usually in

18   November, they put out a new version.  It changes a little,

19   sometimes more than others, from year to year, but it's like

20   500 pages, like almost 600 pages, so it's a long book, and it's

21   a book that's prepared by a commission -- it's called the

22   United States Sentencing Commission -- and that commission

23   includes some judges, some lawyers, some law professors, some

24   experts in the field of criminal law.  And this book is

25   designed to give guidance to judges like me who have to impose

1  sentences.

2       So, the way it works is that every crime or type of

3  crime is covered by a chapter in this book.  So, for a case

4  like this one, involving robbery, I would go to the chapter

5  that relates to robbery.  And once I'm in that chapter, I'm

6  directed to make certain findings.  So, I'll make a finding

7  about whether guns were used, whether anybody was harmed, how

8  much money was taken, and depending on the answers to those

9  questions, I am directed to assign points, and it's a process

10  of basically adding and subtracting points.  And at the end of

11  that process, I come up with a number, or a total, and that

12  total is referred to as the offense level.

13       I then go to another chapter in this book that relates

14  to what's called criminal history.  And not surprisingly,

15  people who have prior convictions, people who have gone to

16  prison before, well, they're more likely than not going to be

17  treated more harshly than people who have no prior convictions.

18  And so I go to the chapter on criminal history, and I am again

19  directed to make findings about whether there were prior

20  convictions, if so, when they were, if so, for how long the

21  sentence was imposed, and depending on the answers to those

22  questions, I, again, assign points, I total those, and I come

23  up with another number.  That number is referred to as the

24  criminal history category.  There are six criminal history

25  categories.  Category I is the lowest and least serious,

1    category VI is the highest and most serious.

2         Then with those two numbers that I have told you

3    about, the offense level on the one hand, the criminal history

4    category on the other, I then go to the back of this book where

5    there's a grade or a table, and I don't know how good your

6    eyesight is, it's probably hard to see, but it's a chart,

7    basically, and it's got a bunch of columns and rows, and on the

8    far left-hand column, it says at the top "Offense Level," and

9    that column goes down, it's numbered from 1 through 43.  So, I

10   will, on the day of sentencing, go down that column, and I'll

11   keep going till I get to the number that I found to be the

12   offense level in this case.  I'll then go across these other

13   columns, which are the criminal history categories, one for

14   each criminal history category, and I will keep going until I

15   reach the criminal history category that I found to be the

16   appropriate one in this case.  And where my finger finally

17   rests in that process, well, that would be the range that in

18   the view of the commission that wrote this book would be

19   appropriate.  And the range is set forth in terms of months.

20   So, I'll go through that process, and I will then announce the

21   range.

22        Now, I'm not required to follow this book -- I'm free

23   to sentence above or below the range that's in this book -- but

24   I do have to make my findings under the book, I have to

25   consider it, I have to make my findings, and I have to announce

H3RKGREP

1   the range, because that's one of the factors that I have to

2   consider.  Okay?

3          THE DEFENDANT:  Yes.

4          THE COURT:  And then, finally, the last factor that I

5   have to balance, along with all the others I've mentioned, is

6   what's sometimes referred to as the need to avoid unwarranted

7   sentencing disparities between similarly situated people.

8          Now, what does that mean?  Well, what it means,

9   basically, I think, is this:  Before imposing a sentence on you

10  in this case, I really have to take a step back and make sure

11  that the sentence I'm imposing here is roughly consistent with

12  sentences imposed in other cases involving defendants who are

13  similarly -- who have similar histories who engage in similar

14  conduct.  And that's because it would be wrong, I think, if you

15  had people who were very similar, who engaged in similar crime,

16  had similar criminal histories, and, yet, some of them did the

17  top, they really got clobbered, and others did almost nothing

18  simply because there were different judges involved or

19  different lawyers involved.  That would look arbitrary, and it

20  would probably promote disrespect for the law, and so judges

21  are told that we need to make sure that the sentences are

22  consistent where the cases and individuals are similar,

23  recognizing no cases are exactly alike, but where there are

24  similarities, then those similarities should be reflected in

25  the sentences imposed.  Okay?

H3RKGREP

1      So, do you have any questions about any of those

2  factors that I just mentioned?

3      THE DEFENDANT:  No.  I think I got it.

4      THE COURT:  So, my job at sentencing will be to

5  balance those things out because some of them might argue for a

6  pretty tough sentence, while others might argue, hey, this guy

7  deserves a break, and, so, my job will be to balance that.  And

8  it's sometimes a very difficult thing, and sometimes it's more

9  art than science.  It's not simply plugging in numbers on a

10 calculator.  But that will be the process that I engage in.

11 Okay?

12      THE DEFENDANT:  All right.

13      THE COURT:  All right.

14      Now, let me make it clear to you, however, that if you

15 were to be unhappy with the sentence that I impose, you were to

16 think, wow, this guy gave me a sentence that I think is a lot

17 higher than I was expecting and is a lot higher than what I

18 think is fair, you certainly would be entitled to your opinion,

19 and you might even be entitled to appeal up to the Court of

20 Appeals to say I got it wrong, but you wouldn't be able to say,

21 hey, I want my guilty plea back, I want to be able to go to

22 trial, I want a do-over.  That will not happen.

23      Do you understand?

24      THE DEFENDANT:  Yes, I do, your Honor.

25      THE COURT:  I said before that we had not yet crossed

1  the point of no return, but we were getting pretty close.  Once

2  you've entered your guilty plea, and once I've accepted it,

3  then ordinarily it's very difficult, if not impossible, to get

4  it back, okay?  And certainly, if you waited until the time of

5  sentencing to say, wow, this guy Sullivan is a nut, that would

6  be way too late.  Okay?

7          THE DEFENDANT:  Yes, your Honor.

8          THE COURT:  All right.

9          Now, I understand there's a plea agreement in this

10  case.  I've seen a draft of it.  What I have is a letter dated

11  March 13th.  It's addressed to Mr. de Castro from Christopher

12  DiMase, who's the other prosecutor on this case.  It's a

13  six-page single-spaced document.

14          Do you have that in front of you there, Mr. de Castro?

15          MR. de CASTRO:  I do, your Honor.

16          THE COURT:  If you could just put it in front of

17  Mr. Green.

18          Sometimes there are multiple originals of these

19  kicking around, which is fine, but I think we'll use the one in

20  front of Mr. Green as the original that becomes a court

21  exhibit.  So, Mr. Green, if you could turn to the last page,

22  there's a signature line at the bottom.  Is that your

23  signature?

24          THE DEFENDANT:  Yes, it is.

25          THE COURT:  Okay.  And before you signed this

1 document, did you read it?

2          THE DEFENDANT:  Yes, your Honor, I did.

3          THE COURT:  And before you signed it, did you discuss

4 it with Mr. de Castro?

5          THE DEFENDANT:  Yes, I did, your Honor.

6          THE COURT:  And you feel you had enough time to

7 discuss it with him?

8          THE DEFENDANT:  Yes, I did.

9          THE COURT:  And you had a chance to ask him any

10 questions that you may have had about this document?

11          THE DEFENDANT:  Yes, your Honor.

12          THE COURT:  Okay.  And, Mr. de Castro, is that your

13 signature underneath Mr. Green's?

14          MR. de CASTRO:  That's correct, Judge.

15          THE COURT:  Before you signed it, you reviewed it with

16 your client?

17          MR. de CASTRO:  Yes.

18          THE COURT:  And you were able to answer any questions

19 he may have had about this document or the consequences of

20 signing this document?

21          MR. de CASTRO:  Yes, I was.

22          THE COURT:  Great.

23          If you could hand that up, I'll mark that as Court

24 Exhibit 2, I'll date and initial it.  I generally give the

25 original back to the government, so I'm sure that the

government can give you a separate original, just so you've got

your own version for your files, but, this way, if there's ever

any question as to what was the document we were referring to

here in court, it will be obvious this is the one since it has

my initials, today's date, and Court Exhibit 2 at the top.

Mr. Green, I'm not going to go over this in tremendous

detail. It's a six-page, single-spaced document. My goodness,

it's not as long as this book, but it's pretty long and pretty

detailed, but there are a couple of features about it I want to

make sure that you understand.

First of all, this is an agreement between you and the

government. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: So, you have certain obligations under

this agreement, and so does the government. Do you understand

that?

THE DEFENDANT: Yes, your Honor.

THE COURT: But I don't have any obligations under

this agreement. I didn't sign it, I didn't negotiate it, and

I'm not bound by it. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: So there may be some things in here that

you and the government agree on that I say, you know what, I

can't agree to that, I disagree. I don't know that that will

happen, but sometimes, occasionally, it does, and if it does,

1    then I have an obligation to follow my own judgment, okay?

2    Even if you and the government agreed to something different.

3    Do you understand that?

4            THE DEFENDANT:  Yes, your Honor.

5            THE COURT:  Now, part of this agreement that I want to

6    make sure you are aware of is that you and the government have

7    stipulated, or you've agreed, to what the sentencing guidelines

8    are in this case, how this book applies in this case.  Do you

9    understand that?

10           THE DEFENDANT:  Yes, your Honor.

11           THE COURT:  So, according to this agreement, you and

12   the government both agree that the offense level is 25, and

13   that the criminal history category is category I, and based on

14   that offense level and that criminal history category, that

15   results in a sentencing range of 57 to 71 months.  So, 57

16   months is a little bit less than five years, and 71 months is a

17   little bit less than six years.  So, that's the range,

18   according to this book, according to how you and the government

19   have calculated the book to apply in this case.

20           Do you understand that?

21           THE DEFENDANT:  Yes, your Honor.

22           THE COURT:  Again, I may reach a different

23   determination.  I may conclude that the book comes out

24   differently, it comes out higher or lower, and if that's the

25   case, I have to follow my own judgment.  Do you understand?

1    THE DEFENDANT:  Yes, your Honor.

2    THE COURT:  Now, you're still free to argue for a

3 sentence below this range, but if I sentence you within that

4 range or below that range, you agree that you won't appeal the

5 sentence.  Do you understand that?

6    THE DEFENDANT:  Yes, your Honor.

7    THE COURT:  So, you may be hoping for something much

8 lower than this guidelines range, but if I sentence you to 71

9 months or anything less than 71 months, even if you're

10 disappointed, it means, according to this agreement, that you

11 will not appeal.  You give up that right as part of this

12 agreement.  Do you understand that?

13    THE DEFENDANT:  Yes, your Honor.

14    THE COURT:  Now, is there any other agreement besides

15 this one that exists between you and the government?

16    THE DEFENDANT:  That's the only agreement.

17    THE COURT:  That's the only one?  Okay.

18    Has anything been left out of this agreement?

19    THE DEFENDANT:  No, your Honor.

20    THE COURT:  Are there any other side agreements that

21 you have with the government, either written or orally, that

22 aren't included in this document?

23    THE DEFENDANT:  No.  No, your Honor.

24    Okay.  No, your Honor.

25    THE COURT:  Okay.  Has anybody threatened you in order

1   to get you to sign this document or to plead guilty here today?

2            THE DEFENDANT:  No, your Honor.

3            THE COURT:  Has anybody offered you anything of value

4   in exchange for signing this document or pleading guilty here

5   today?

6            THE DEFENDANT:  No, your Honor.

7            THE COURT:  Has anybody promised you what your

8   sentence will be?

9            THE DEFENDANT:  No, your Honor.

10           THE COURT:  I guess there is also a forfeiture

11  component to this agreement.  Do you have the forfeiture there?

12  Let's put that in front of Mr. Green.

13           So, Mr. Green, this plea agreement also includes a

14  reference to you forfeiting certain money, certain proceeds,

15  from this crime.  Do you understand that?

16           THE DEFENDANT:  Yes, your Honor.

17           THE COURT:  And, so, in addition to this agreement,

18  then, I was provided with what's called a consent preliminary

19  order of forfeiture/money judgment.

20           THE DEFENDANT:  Yeah.

21           THE COURT:  It's a five-page document, it has eight

22  numbered paragraphs, with a bunch of whereas clauses at the

23  front.  Do you have that in front of you there?

24           THE DEFENDANT:  Yes, I do.

25           THE COURT:  If you turn to the last page, there is,

1   once again, a series of signature lines.  Is -- one of those

2   has your name under it.  Did you sign that document?

3           THE DEFENDANT:  Yes, I did, your Honor.

4           THE COURT:  Before you signed it, did you read it?

5           THE DEFENDANT:  Yes, your Honor.

6           THE COURT:  And you discussed it with Mr. de Castro?

7           THE DEFENDANT:  Yes, your Honor.

8           THE COURT:  And you had enough time to go over with

9   him any questions you may have had about this document and what

10   it means?

11           THE DEFENDANT:  Yes, your Honor.

12           THE COURT:  And, Mr. de Castro, that's your signature

13   below Mr. Green's?

14           MR. de CASTRO:  Yes, it is.

15           THE COURT:  And you know the drill.  I guess I'm

16   getting like a broken record, but it is important.  So, before

17   you signed this document, you reviewed it with your client?

18           MR. de CASTRO:  Yes.

19           THE COURT:  And answered any questions he may have

20   had?

21           MR. de CASTRO:  Yes.

22           THE COURT:  Okay.

23           If you could hand that up to me.  And you're getting a

24   lot of exercise, but it's good for you.

25           MR. de CASTRO:  It's good.

1    THE COURT:  This is one I'm being asked to sign as

2    well, so I will read it more carefully, and then I presumably

3    will sign it and docket it.  But I want to make sure everybody

4    agrees.  There's a blank on page 2:  "Whereas on or about,"

5    blank, "2017, defendant pleaded guilty."  I assume that's

6    today's date, right?

7    MR. de CASTRO:  Yes.

8    THE COURT:  I'm going to insert today's date.  We

9    haven't yet finished this, but we're close.

10   What it says is that the money judgment, the

11   forfeiture amount in this case, is $252,000, and that as a

12   result of this judgment, this order being entered, that you

13   will owe that much money as forfeiture.  Do you understand

14   that, Mr. Green?

15   THE DEFENDANT:  Yes, your Honor.

16   THE COURT:  And I think it will be joint and several

17   with your coconspirator, Mr. Clark, and if you can't -- but if

18   he can't pay anything because he's broke, and you win the

19   lottery or you, when you get out, have access to more money

20   because you're working, then it may be that you have to pay it

21   all.  That's just the way it goes.  Do you understand that?

22   THE DEFENDANT:  Yes, your Honor.

23   THE COURT:  Okay.

24   So it's up to $252,000, plus interest, right,

25   Ms. Graham?  Ms. Graham, plus interest as well?

1          MS. GRAHAM:  Yes.  One moment, your Honor?

2          (Pause)

3          THE COURT:  This is a preliminary order, so at the

4 time of sentencing, I'm likely to impose a final order, and

5 that typically will include interest or certainly could include

6 interest, okay?

7          MS. GRAHAM:  Yes, your Honor.  The agreement doesn't

8 say anything about interest.

9          THE COURT:  So, interest will be up to me, and,

10 typically, I will impose interest.  That's generally what I do

11 unless there's a good reason not to.  Okay?

12          THE DEFENDANT:  Okay.

13          THE COURT:  All right.

14          Mr. de Castro, are you aware of any defense that would

15 prevail as a matter of law or any other reason why Mr. Green

16 should not be allowed to plead guilty here today?

17          MR. de CASTRO:  No, Judge.

18          THE COURT:  So, Mr. Green, at this point, I'm going to

19 ask you to tell me in your own words -- you can stay seated --

20 but tell me in your own words what it is you did that makes you

21 guilty of this crime.

22          THE DEFENDANT:  In December, I went to Boston and

23 participated --

24          THE COURT:  Take your time.  So, in December of 2000?

25          THE DEFENDANT:  '14.

1          THE COURT:  '14?

2          THE DEFENDANT:  Yeah.  I went to Boston and get

3     involved with a robbery.

4          THE COURT:  Okay.  And tell me a little bit about the

5     robbery.

6          THE DEFENDANT:  A friend of mine called from

7     New York -- called me from Boston and asked me if I could drive

8     up.  We rented a car.  He didn't have a license, so we drove it

9     up there.  When I got up there, the plan was to rob somebody.

10     And I didn't say no.  I partic -- acted along with them.

11          THE COURT:  So, you were with them?

12          THE DEFENDANT:  Yeah.

13          THE COURT:  Understanding that they were going to be

14     engaged in a robbery?

15          THE DEFENDANT:  First, I didn't know until I got

16     there, but once I got there, I didn't say no to them.

17          THE COURT:  You continued in the process?

18          THE DEFENDANT:  I continued with it.

19          THE COURT:  Okay.  And you knew at that time --

20          THE DEFENDANT:  Yeah.

21          THE COURT:  -- that what you were doing was wrong and

22     illegal?

23          THE DEFENDANT:  I know at that time.  I was just too

24     stupid to back out.

25          THE COURT:  And who was being robbed?

1          THE DEFENDANT:  It was a guy that drive around with

2   money, I think.

3          THE COURT:  Money in his truck?

4          THE DEFENDANT:  Armored car.

5          THE COURT:  An armored car.

6          Okay.  So that probably covers the interstate commerce

7   part of this, put Ms. Graham will talk about that.

8          Part of this plea agreement, I think, said that you

9   were going to waive venue.  Remember I said some part of the

10  crime has to have taken place here in New York, in the Southern

11  District of New York.  It seems like most of this crime took

12  place up in Boston, and that when you drove from New York to

13  Boston, at least initially, you weren't aware of what the plan

14  was.  By the time you got to Boston or Massachusetts, you did

15  understand, and you agreed to participate; is that right?

16         THE DEFENDANT:  Yeah, I didn't back down.

17         THE COURT:  Yes.  And then did you come back to

18  New York at that point?

19         THE DEFENDANT:  Yeah, we drove back straight to

20  New York.

21         THE COURT:  With the money?

22         THE DEFENDANT:  With the money.

23         THE COURT:  Okay.  So it may be there would be venue

24  here anyway, but you've agreed to waive venue, so that even if

25  that isn't sufficient for venue, you've agreed that that's not

1  a problem, and you consent being to prosecuted here rather than

2  Massachusetts; is that correct?

3  THE DEFENDANT:  Yes, your Honor.

4  THE COURT:  Okay.  All right.  And there was some

5  force used -- if not by you, at least by others -- in engaging

6  in this robbery?

7  THE DEFENDANT:  Yes, force.

8  THE COURT:  They used force, a gun, or a threat of gun

9  or violence.

10  THE DEFENDANT:  They went out with a gun and robbed.

11  THE COURT:  Okay.  So, that's enough to establish the

12  force element of this crime.

13  Ms. Graham, is that a satisfactory allocution to your

14  mind?

15  MS. GRAHAM:  Yes, your Honor.  We would just add a

16  proffer that they robbed an employee of an ATM restocking

17  business that affects interstate commerce.

18  THE COURT:  Yes.  Okay.

19  And, Mr. de Castro, is that a satisfactory allocution

20  to your mind?

21  MR. de CASTRO:  Yes, Judge.

22  THE COURT:  All right.  I think so, too.  I think that

23  covers all the elements as necessary.

24  So, at this point, I'm going to ask Ms. Graham just to

25  very briefly summarize the elements of this crime -- excuse me,

1    to very briefly summarize the government's evidence in this

2    case, what the government would show if the case went to trial.

3              Listen to her carefully, Mr. Green.  If when she's

4    finished, you disagree with something she said, let me know,

5    and I will give you a chance to be heard on that.  Okay?

6              THE DEFENDANT:  Okay, your Honor.

7              THE COURT:  Ms. Graham.

8              MS. GRAHAM:  The evidence would include most

9    critically the testimony of one of Mr. Green's coconspirators

10   in the robbery, which would be corroborated by testimony from

11   the victim of the robbery, surveillance video of parts of the

12   robbery, as well as call detail records and cell site records

13   from the phones that were used by the conspirators.

14             THE COURT:  All right.

15             Do you have any questions or any disagreement with

16   what Ms. Graham just said, Mr. Green?

17             MR. de CASTRO:  Judge, I'm just repeating the last

18   part of it.

19             THE COURT:  Okay.

20             (Pause)

21             MR. de CASTRO:  Thank you, Judge.

22             THE DEFENDANT:  Sorry.

23             THE COURT:  All right.  So, you don't disagree with

24   anything that Ms. Graham just said?

25             THE DEFENDANT:  No, your Honor.

1          THE COURT:  Okay.

2          So, let me now ask you to stand, Mr. Green.  Oh, is

3    that --

4          THE DEFENDANT:  That's okay.

5          THE COURT:  You're okay?

6          How do you now plead to Count Two of the indictment,

7    guilty or not guilty?

8          THE DEFENDANT:  Guilty, your Honor.

9          THE COURT:  Did you do the things you're charged with

10   doing in this indictment?

11         THE DEFENDANT:  Yes, I did.

12         THE COURT:  Are you pleading guilty because you are

13   guilty?

14         THE DEFENDANT:  Yes, your Honor.

15         THE COURT:  Are you pleading guilty voluntarily and of

16   your own free will?

17         THE DEFENDANT:  Yes, your Honor.

18         THE COURT:  All right.  Mr. Green, because you

19   acknowledge that you're guilty, because your plea is entered

20   knowingly and voluntarily, and is supported by an independent

21   basis in fact for each of the elements, because you know your

22   rights, and you've agreed to waive your rights, I accept your

23   guilty plea, and I find you guilty on Count Two of the

24   indictment.  So, have a seat.

25         What we're going to do now is set a date for

H3RKGREP

sentencing.  Normally, I would set a sentencing date about

three or four months out.  That's to allow the probation

department to prepare a report that is very helpful to me in

deciding what's an appropriate sentence.  That report is

referred to as a presentence report, or a PSR, and it's often

quite lengthy, it might be 25 or 30 pages long, and it will

include a lot of information, much more than I have now,

information about you and your life, from your birth right up

until now, about your work history, about your health, about

your family circumstances.  It will also have a lot more

information about this crime.  I've heard a little bit about

this crime, but the presentence report generally includes a lot

more detail.  If there were victims involved, the victims will

have a chance to be interviewed and be heard from.  So, that

will also be part of the report.

        So, the way the report is really prepared is the

probation officer interviews a lot of people.  So, they'll

interview your family members, they'll interview your

employers, perhaps, they'll interview the victim, they'll

interview the agents who worked on the case, and they'll also

interview you.

        THE DEFENDANT:  Okay.

        THE COURT:  So, I assume, Mr. de Castro, you want to

be present for any interview?

        MR. de CASTRO:  Yes, Judge.

1    THE COURT:  And, so, I'll direct that no interview

2    should take place unless Mr. de Castro is there.

3        I don't think that will be a problem.  I've never had

4    a situation where probation jumps the gun and tries to

5    interview somebody without their lawyer.  But if that were to

6    happen, you would just say, hey, my lawyer is not here, the

7    Judge told me not to proceed without my lawyer.  But once the

8    interview starts -- Mr. de Castro is there and the interview

9    starts -- I will expect then that you will be truthful and

10   complete in all your answers to the probation officer.  Okay?

11       THE DEFENDANT:  Yes, your Honor.

12       THE COURT:  The probation officer works for me.  They

13   don't work for the government, they work for the Court.  So,

14   treat the probation officer with the same respect, the same

15   courtesy that you would treat me with and that you have treated

16   me with.  Okay?

17       THE DEFENDANT:  Yes, your Honor.

18       THE COURT:  Because if you were to make any false

19   statements to the probation officer, well, again, that would be

20   a crime.  It wouldn't be perjury, but it would be the crime of

21   obstruction of justice, and it would carry consequences in this

22   case, for the guidelines, so you could be separately prosecuted

23   for obstruction of justice.  You also would probably get more

24   points under this book, and certain of the subtractions that

25   might otherwise apply wouldn't apply, so that your numbers

1  would go up, and the range would be higher, and that's in no

2  one's interests.  I have no reason to think you're going to do

3  that.  I just want to make sure you're very careful and very

4  thorough in all your answers to the probation officer, okay?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  Once the probation officer has completed

7  the report, he or she will send it to you and your lawyer, as

8  well as the government.  You should read it carefully, word for

9  word, cover to cover.  If there is anything in that report that

10  you think is inaccurate, tell Mr. de Castro.  He will then

11  contact the probation officer to say, hey, we disagree with

12  what you have here, here, and here.  The probation officer --

13  the government will have the same opportunity.  The probation

14  officer will then issue a final report.  That final report will

15  come to me.  That's the first one I will see.  I won't get the

16  first one, I'll get the final report.  You will also get a copy

17  of the final report, so will the government.  You, again,

18  should read the final report cover to cover, word for word,

19  don't assume that it's unchanged from the prior version, don't

20  assume that your requests for changes were honored, they may

21  not have been.  So, it might be totally different, it might be

22  very much the same.  Don't assume anything.  Read it carefully.

23  If there are any portions that you think are inaccurate, tell

24  Mr. de Castro.  Whether you told him from the prior version or

25  not, tell Mr. de Castro.  At that point, he will make formal

1  objections to me if there's anything in there that he thinks is

2  inaccurate.  The government, again, will have the same

3  opportunity.

4           If there are disputes about what's contained in the

5  report, if there are objections, in other words, I will resolve

6  them.  We may have, like, a mini trial, maybe I'll hear from

7  witnesses, maybe I'll review evidence, or it may be that I will

8  just hear from the lawyers, it might be just arguments not so

9  much about what the factors are, as much as what conclusions

10 should be drawn from certain facts.  So we'll see.  Whatever

11 the objections are, I will resolve them in the way that I think

12 is appropriate.  But I'll be very clear about what I'm doing.

13 Okay?

14          THE DEFENDANT:  Okay, your Honor.

15          THE COURT:  Now, in addition to that presentence

16 report, I will also accept whatever submissions are made in

17 connection with sentencing.  So, I expect that Mr. de Castro

18 will make a written submission on your behalf, telling me a

19 little bit about you as a person, explaining why the different

20 factors that I mentioned support a particular sentence.  He's

21 free to make a recommendation.  The government will have the

22 same opportunity.

23          Naturally, I will read those reports.  They can be

24 really valuable.  Excuse me, those submissions.  So I'll read

25 the PSR from the probation department, I'll read the

submissions from the lawyers. If there's anybody else who

wants to send me a letter, that's fine. That's very helpful,

frankly. I mean, the probation officer will often have

interviewed people, and so the statements of others close to

you will often be reflected in the presentence report, but if

you or anybody close to you wants to send me a letter to tell

me more about you and more about what this case has meant to

you, what impact it's had on you, that's fine. I will read

those letters. They can be really helpful. They give me a lot

more insight than I have. I don't know you well, right? I've

seen you in court a couple of times, but I don't know you well.

So, if others want to write letters, or if you yourself want to

write a letter, you're very welcome to.

    The only thing I would ask is that if you or others

want to write me a letter before sentencing, have the letters

sent to Mr. de Castro. He'll collect them all, he'll then

attach them to his submission, and then send it to me. That

way, I'll be confident that I got everything all at once, and I

will be more confident that nothing has slipped through the

cracks, okay?

    Now, on the day of sentencing, we'll come back in here

to court. At that point I will go over with you and the

lawyers what I have received and reviewed in connection with

sentencing. That way, if I've left something out, you can say,

well, there was another letter, Judge, that you didn't mention,

1    and then we can correct it.  So, I'll go over everything that I

2    have reviewed and received.

3            I will then resolve any objections, if there are

4    objections, to what's in the presentence report.  I will then

5    make my findings under the guidelines, and then at that point,

6    I will hear from the lawyers.  They're free to expand upon or

7    elaborate on what they wrote in their submissions.  They're

8    free to respond to each other.  They may respond to questions

9    that I ask, but I'll certainly give them an opportunity to be

10   heard here in court.

11           If there are victims who wish to be heard, they, too,

12   will have an opportunity to be heard in court, they have a

13   right to be heard, so I'll allow them that opportunity.

14           And, finally, I will give you an opportunity to speak,

15   if you'd like.  You're not required to, but you have a right to

16   speak, and I'll certainly give you that opportunity, and I'd be

17   happy to hear from you.  Okay?

18           THE DEFENDANT:  Thank you, your Honor.

19           THE COURT:  Now, after all of that, then I will

20   finally tell you the sentence that I intend to impose, I'll

21   explain my reasons, I'll then check with the lawyers to make

22   sure I haven't done something illegal or improper, and assuming

23   not, then I will formally impose the sentence.  So, that's the

24   process.  And it's going to take a little time, but do you have

25   any questions about any of that?

1          THE DEFENDANT:  No, your Honor.

2          THE COURT:  So let's pick a date.  What do we have,

3   Ari?

4          Is that okay, Friday, July 28th?  Is everybody around

5   that day?

6          MS. GRAHAM:  Yes, your Honor.

7          MR. de CASTRO:  That's fine.

8          THE COURT:  What time, afternoon or morning?

9          THE LAW CLERK:  It looks like the afternoon is better.

10          THE COURT:  2:30?  Is that okay?

11          MS. GRAHAM:  That's fine, your Honor.

12          THE COURT:  Is that all right?

13          Okay.  If it's not a good time, we can do another

14   time, but often I do these on Fridays, just because I like to

15   have a block of time where I know I won't be interrupted.  So,

16   Friday, July 28th, at 2:30.

17          Between now and then, you're going to remain in

18   custody.  You'll get credit for the time that you're serving

19   that will count toward your sentence, I believe.  Stay in touch

20   with Mr. de Castro.  If that sentencing date changes for

21   whatever reason, he'll let you know.  If between now and

22   July 28th, you think you need to see me for whatever reason,

23   let me know.  You can tell Mr. de Castro, he'll set something

24   up, and we can then schedule something.  Okay?

25          THE DEFENDANT:  Thank you.

H3RKGREP

1    THE COURT:  But my hunch is that there's a lot to do,

2    and so make sure that you're in touch with Mr. de Castro and

3    make sure that you're preparing for the sentencing because that

4    will be a really important day, obviously.  Okay?

5    THE DEFENDANT:  Thanks.

6    THE COURT:  Is there anything else we should discuss

7    today?

8    MS. GRAHAM:  Nothing from the government, your Honor.

9    MR. de CASTRO:  No, Judge.  Thank you.

10    THE COURT:  All right.

11    So, good luck to you, Mr. Green.  I'll see you in a

12    few months.

13    Let me thank the court reporter.  Let me thank the

14    marshals as well.

15    And I guess the trial that was scheduled in this case,

16    for May, I think it was -- or was it April -- anyway is now

17    adjourned, and so we'll just proceed with sentencing, as I

18    said.

19    Great.  Okay, thank you.

20    MR. de CASTRO:  Thank you.

21    THE COURT:  Let me give this back to you, Ms. Graham.

22    Don't be shy, Ms. Graham.  Put yourself on the docket

23    sheet.

24    MS. GRAHAM:  Yes, your Honor.

25    * * *