H7S9GRE1                    Sentencing

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        16 CR 781 (RJS)

5   GARFIELD GREEN,

6               Defendant.

7   ------------------------------x

8                                       New York, N.Y.
                                        July 28, 2017
9                                       2:39 p.m.

10

    Before:
11
                    HON. RICHARD J. SULLIVAN
12
                                         District Judge
13

14                        APPEARANCES

15  JOON H. KIM
         Acting United States Attorney for the
16       Southern District of New York
    MARGARET GRAHAM
17       Assistant United States Attorney

18  CESAR DE CASTRO
         Attorney for Defendant
19

20

21

22

23

24

25

1           (In open court; case called)

2           MS. GRAHAM:  Good afternoon, your Honor.

3           Margaret Graham on behalf of the government.

4           THE COURT:  Good afternoon, Ms. Graham.

5           For the defendant.

6           MR. DE CASTRO:  For Mr. Green, who is seated to my

7    left, Cesar de Castro.  Good afternoon, Judge.

8           THE COURT:  Mr. de Castro, Mr. Green, good afternoon.

9           So we're here for sentencing.  Mr. Green pled guilty

10   before me back on March 27.

11          I want to go over with everyone what I have received

12   and reviewed in connection with sentencing.  If I've left

13   anything out, of course let me know.

14          So, first of all, I have reviewed the transcript of

15   the guilty plea that took place on March 27.  I was here for

16   this.  I presided.  But I think it's always a good practice to

17   review what was said.  So I've done that.

18          I've also reviewed the presentence report that was

19   prepared by the probation department.  That report is dated

20   June 16.  It is a 25-page report, 24 pages plus a cover page.

21   It includes a sentencing recommendation.

22          I've also reviewed the sentencing submission of

23   Mr. de Castro.  Actually I guess I have two versions of it.  I

24   have one dated June 25 -- excuse me, July 25 and another that's

25   dated July 14.  They are largely the same but one makes express

1    reference to attempts at cooperation and the other does not.

2    So I guess the reason is there's a desire not to put the

3    attempts at cooperation on the docket.

4            Is that what it was?

5            MR. DE CASTRO:  Temporarily, Judge, yes.  That's one

6    issue we wanted to discuss.

7            THE COURT:  I've reviewed both.  Each had submissions

8    attached to it or letters attached to it.  I've read those.

9    They're from friends and family members.  They are very

10   thoughtful letters.  So I've reviewed those.

11           I've then reviewed the government's sentencing

12   submission which is dated July 24.  That submission is a

13   four-page, single-spaced letter.  It's really three pages.

14   There's a long break on three and then a very short paragraph

15   on four.

16           So that's what I have.  Is there anything else I've

17   overlooked?

18           Ms. Graham?

19           MS. GRAHAM:  Your Honor, nothing that you've

20   overlooked, but we have for you today an order of restitution

21   which we have also shared with defense.

22           THE COURT:  Restitution, not forfeiture or --

23           MS. GRAHAM:  No forfeiture.  There was a preliminary

24   consent order submitted to you at the plea to become final

25   today.

1          THE COURT:  Do I have the -- I have a consent

2    preliminary order of forfeiture but I don't see the original.

3    Do you believe I've got the original?

4          MS. GRAHAM:  I will check, your Honor.

5          THE COURT:  I have a copy.

6          MS. GRAHAM:  Which is fine for docketing purposes.

7    But I will certainly check.

8          THE COURT:  It has signature lines for everybody

9    including me but also Mr. Green, his lawyer, and the government

10   and I don't seem to have the executed version.

11         MS. GRAHAM:  Yes.  I do have that here.

12         THE COURT:  So hand that up with the restitution

13   order.

14         MS. GRAHAM:  Yes.

15         THE COURT:  Now I notice in the presentence report

16   there was a reference to the victim but there was no statement

17   from the victim, no victim statement.  There was a statement

18   from his -- the victim's brother and that person is also

19   technically a victim because they are president or the head of

20   the company that was victimized.  But the individual who had

21   the gun basically drawn on him, placed against his head, that

22   person has not submitted anything.

23         Each victim -- all victims have a right to address the

24   court.  So, I'm curious.  Have the victims been contacted?

25   Have they indicated whether they wish to be here?

1    MS. GRAHAM:  Yes, your Honor.  I spoke with Carl, who

2    was the actual victim, on the phone.  Carl and Franz, who is

3    the brother and owner of the company, were both contacted by

4    our victim witness unit and were sent notification letters,

5    including of this proceeding, informing them of the sentencing

6    and their right to be here.

7              THE COURT:  They have declined to appear.

8              Have you had any contact with them directly?

9              MS. GRAHAM:  Yes.  I spoke with Carl directly.  He has

10   not submitted an official statement or decided to come today.

11             THE COURT:  Mr. de Castro, is there anything else that

12   you think I should have reviewed that I haven't mentioned?

13             MR. DE CASTRO:  No, Judge.

14             THE COURT:  So, Mr. Green, let me remind you how this

15   is going to go.  When you pled guilty before me I explained the

16   general process.  But you probably had a lot going on in your

17   mind that day.  So I want to just remind you.

18             Before I impose a sentence, I have to consider a lot

19   of different factors.  One of the factors that I have to

20   consider is United States Sentencing Guidelines.  So we're

21   going to talk about that.  There are some other factors that I

22   also have to consider.  I'll remind you what those are.  But

23   we'll talk about those things.

24             I'm first now going to ask you about the presentence

25   report that was prepared by the probation department.  I want

1    to make sure you had a chance to see that and had a chance to

2    discuss it with your attorney, Mr. de Castro.

3              So I don't know if you have a copy nearby.

4              MR. DE CASTRO:  Yes, right here.

5              THE COURT:  You've seen that document before today?

6              THE DEFENDANT:  Yes, I did your Honor.

7              THE COURT:  And you discussed it with Mr. de Castro?

8              THE DEFENDANT:  Yes, I did.

9              THE COURT:  And, Mr. de Castro, you've seen it and

10   discussed it with your client?

11             MR. DE CASTRO:  Yes.

12             THE COURT:  Do you have any objections to what's in

13   the report?

14             MR. DE CASTRO:  No objections.

15             THE COURT:  Ms. Graham, do you have any objections to

16   what's in the report.

17             MS. GRAHAM:  No, your Honor.

18             THE COURT:  So, we're going to begin with the

19   sentencing guidelines and, as I told you before, the sentencing

20   guidelines are a big book, a book that's put out by a

21   commission, the United States Sentencing commission.  And that

22   commission consists of some judges and some lawyers and some

23   experts in the field of criminal law.

24             So the point of this book, the purpose of this book is

25   to give guidance to judges like me.  So for every crime or type

1   of crime there's a chapter in this book, and the judge is

2   directed to go to the chapter that relates to the crimes in the

3   case and then the judge makes findings according to what's in

4   the book.

5           So the book might direct the judge to make a finding

6   in the case of a robbery about whether force was used, whether

7   guns were used, whether anybody was injured, whether -- how

8   much money was taken or what the value of the loss was.  And

9   depending on the answers to those questions, the judge is

10  directed to assign points.  And it's a fairly -- it's a fairly

11  simple, basically accounting system, just adding and

12  subtracting points.  And at the end of that process the judge

13  comes up with a number.  That number is referred to as the

14  offense level.

15          The judge then goes to another chapter in this book

16  and that's the chapter that relates to criminal history.  And,

17  not surprisingly, people who have committed crimes before,

18  people who have gone to prison for those crimes, they will

19  typically be treated more harshly than people who have no prior

20  convictions.

21          So the judge will make findings about whether there

22  were prior convictions; if so, when and for how long the

23  sentence was.  And depending on the answers to those questions,

24  the judge then assigns points and comes up with another number.

25  That number is referred to as the criminal history category.

1       There are six criminal history categories.  Category I

2  is the lowest and least serious.  Category VI is the highest

3  and most serious.

4       And then with those two numbers that I've talked

5  about, the offense level on one hand and the criminal history

6  category on the other, the judge goes to the back of this book

7  where there's a grid or a table.

8       It might be hard for you to see, but I'm sure

9  Mr. de Castro has gone over it with you.  It's basically just a

10  table.  And there's a column here on the far left.  That's the

11  offense level column.  It's numbered 1 through 43.  And so the

12  judge goes down that column and keeps going until he or she

13  gets to the number that the judge found to be the offense level

14  in the case.

15       The judge then will stop there and go across these

16  other columns from left to right each of which reflect a

17  criminal history category.  And the judge keeps going until he

18  gets to the criminal history category that the judge found to

19  be appropriate.  And where the judge's finger finally stops on

20  this chart, that is the range in terms of months that, in the

21  view of the commission that prepared this book, would be

22  appropriate.

23       So, that's how the book works.  Now, it's not a

24  mandatory book.  I don't have to follow this book.  I can go

25  higher.  I can go lower.  But I do have to consider the book.

1    And I have to make my findings about the offense level and the

2    criminal history category as part of the sentencing.  I have to

3    make those findings.

4            Okay?

5            THE DEFENDANT:  All right.

6            THE COURT:  Do you have any questions about that?

7            THE DEFENDANT:  No, your Honor.

8            THE COURT:  So we're going to spend a few minutes

9    talking about that because it's sort of the starting point even

10   though it's not mandatory.  All right.

11           So in this case I don't think there's any real dispute

12   about how the guidelines apply here.  The presentence report

13   sets forth the guidelines on page -- just bear with me,

14   sorry -- six.  It finds that the base offense level, because of

15   the nature of this crime, it's a Hobbs Act robbery, carries a

16   sentence -- carries a level of 20.  Then 6 levels are added

17   because a firearm was used.  That's pursuant to Section

18   2B3.1(b)(2)(b).  There's then a two-level increase because of

19   the amount of the loss that was involved in this case.  It's

20   over $250,000.  So that's a two-level increase under

21   2B3.1(b)(7)(C).  So that puts us at level 28.

22           Because you accepted responsibility, because you

23   admitted that you are guilty, you saved the government and the

24   court the time and resources necessary to try the case, and

25   because you acknowledge that you are guilty, you get some

H7S9GRE1                    Sentencing

1  credit for that.  So you get three levels off.  And then that

2  then results in a total guidelines level of 25.

3           You have one prior conviction.  That was from 2005

4  when you were convicted of an assault.  You were given three

5  years probation.

6           I had a question about that.  Because the crime was

7  committed more than ten years and after that -- maybe it's not

8  quite ten years after that.

9           Ten years would mean it doesn't get counted, right?  I

10  thought.  Or maybe -- term of incarceration is when you finish

11  the term of incarceration.  The term of probation, I'm not sure

12  if it's ten years from when you finish the term of probation or

13  it's just ten years from the date of the sentence.

14           I don't think it makes any difference.  It's still

15  category I, no matter what.  But that was one question I had.

16  Ms. Graham, do you have any thoughts on that?

17           MS. GRAHAM:  No, your Honor.  I'm happy to look into

18  it if you wish but none at the moment.

19           THE COURT:  Bear with me one second.

20           MS. GRAHAM:  Your Honor, the offense was in 2014.

21           THE COURT:  It's 2014.  That makes sense then.  That's

22  fine.

23           So, based on a criminal history category I and an

24  offense level of 25 that yields a guidelines ranges of 57 to 71

25  months.  So a little less than five years to a month shy of six

1   years.  And that's according to the book.

2              But, as I said, I'm free to go higher or lower, as I

3   see fit.

4              The other factors that I have to consider in deciding

5   whether to go higher or lower include your own personal

6   history; so, the facts and circumstances of your life, from

7   your birth right up until now, includes things like your work

8   history, your educational history, your family circumstances,

9   and other stuff too.  You're unique so I have to make sure I

10  consider your unique experience.  So that's one factor I have

11  to consider.

12             Another factor I have to consider relates to the facts

13  and circumstances of this crime.  This is obviously an

14  incredibly serious crime.  And it's important that the sentence

15  that I impose reflect the seriousness of this crime; that it

16  promotes respect for the law, first of all, and that it also

17  provides a just punishment for the crime.  So that means I have

18  to look at the details of this crime, not just what it's

19  called, but what you did, what others did, what the

20  consequences of it were, what harms resulted from it.  All of

21  that is relevant to sentencing.

22             Another factor that I have to consider is a little

23  different than those others that I mentioned and that's

24  referred to as deterrence sometimes.  And that's the need to

25  deter or discourage you and others from committing crimes like

1   this in the future.  It's the hope that by imposing a sentence

2   on you in this case I will send a message to you and perhaps to

3   other people that this just won't be tolerated and you can't do

4   it and the hope is that people will get the message, including

5   you, but not limited to you.  The hope is that people will

6   think twice before they engage in any kind of conduct like this

7   and that there will be, as a result, less crime in the future.

8   That's the hope.

9          Now I don't have a crystal ball so it's impossible for

10  me to know exactly what the impact will be on future behavior.

11  But I have to use my best judgment.  That's something that

12  Congress has said courts have to consider.  So that's another

13  factor I have to take into account.

14         Another factor I have to consider are your own needs

15  while you're in custody.  So some people have different health

16  needs or mental health needs, drug treatment needs.  You have

17  some health issues different than most defendants and so I have

18  to make sure that I consider that in fashioning a sentence and

19  make sure that you're at a place where those needs can be

20  addressed.  So that's another factor.

21         I guess finally the last factor that I have to

22  consider is sometimes referred to as the need to avoid

23  unwarranted sentencing disparities between similarly situated

24  people.

25         And what that means basically is that before I

1    impose -- before I impose a sentence on you in this case I have

2    to take a step back and make sure that the sentence imposed

3    here is consistent with, is roughly in line with sentences

4    imposed in other cases involving similar conduct and involving

5    defendants with similar histories.  Because it's important that

6    where there are real similarities that the sentences be

7    similar, that they not be all over the place.  Because that

8    would -- if they were all over the place, that would probably

9    encourage disrespect for the law and make people think that the

10   whole system is arbitrary.

11          So those are the different factors I have to consider.

12   I mentioned these I think on the day you pled guilty.  But it's

13   good to remind you because there shouldn't be any mystery here.

14          Now the hard part is balancing these things.  I have

15   to choose a sentence that I think is appropriate in light of

16   all these different factors.  Sometimes these factors are in

17   tension with each other.  Sometimes some of these factors say a

18   really harsh sentence is appropriate, while other factors would

19   argue for a lenient sentence.  So the balancing is really what

20   it's all about.  It's a hard thing.

21          So the way we're going to go about this is I have

22   letters from your lawyer, from the government's lawyer.  I have

23   letters from family members and friends of yours, all of which

24   give me a lot of insight to you.  And they are very helpful.  I

25   thank those who took the time to write.

1     I have, of course, the presentence report that gives

2  me a lot of facts.  But I'm also going to hear from the lawyers

3  now.

4     So I'll begin with Mr. de Castro.  I'll let him speak

5  about all or any of these factors that I mentioned.  I'll let

6  him address any of the issues that are raised in the

7  government's submission or in the presentence report.  I may

8  have some questions as we go.

9     After he's finished, I will give the government,

10  Ms. Graham, an opportunity to speak.  She can respond to

11  Mr. de Castro.  She can make her own points related to the

12  different factors.  I will give her the same opportunity that I

13  gave Mr. de Castro.  I may have questions for her too.

14     Once I've finished with them, assuming there are no

15  victims here, because, as I said, they would have an absolute

16  right to speak, I will then give you an opportunity to speak.

17  You're not required to speak, but you have a right to.  And

18  you're welcome to.  So I will give you a chance to do that.

19  And then after all of that, then I will tell you the sentence

20  that I intend to impose.  I will explain my reasons.  I'll

21  check with the lawyers to make sure I haven't done something

22  illegal or improper under the law.  Assuming not, then I will

23  formally impose the sentence.

24     So we're in no rush.  We're going to take our time.

25  This is an important day in your life, obviously, and I want to

H7S9GRE1                    Sentencing

1  make sure that we do this carefully and thoughtfully.  All

2  right.

3            THE DEFENDANT:  Okay.  Thanks.

4            THE COURT:  So, Mr. de Castro, I've read your

5  submission.  It's characteristically thorough.  But I'm happy

6  to hear whatever else you'd like to add.

7            MR. DE CASTRO:  Judge, I don't have a terrible amount

8  to add.  I think, first, I'd like to start with, one, you see

9  crutches here.  Slightly different.  He doesn't normally use

10  crutches.  And in footnote two of my submission I detailed the

11  difficult time he's had at MCC -- well not really MCC, really

12  at MDC.  I want to first say I didn't write that footnote to

13  criticize the MDC in any way or the MCC in any way.  I think

14  that he is having a particular difficult time in a very strange

15  situation where he was moved to MDC, and there was this piece,

16  one piece missing from his prosthetic that he has been

17  struggling without.  It really makes the prosthetic unstable

18  and puts a great deal of pressure on what's remaining of that

19  leg.

20            The reason he has crutches is because the piece

21  finally arrived and -- they had to order a new piece.  The

22  piece finally arrived, but now the bone is so swollen and

23  bruised right now that they want him to heal before he

24  continues wearing the prosthetic with the piece.  So I just

25  wanted to update the court there.

1          I did not get the court involved and I didn't think I

2     needed to, and I also didn't get the government involved

3     because MDC and MCC counsel were responsive.  They were telling

4     me that they were having problems.  I was getting frustrated.

5     Mr. Green was as well.  But he understood the difficulties that

6     were going on.  So that's my update on his health.

7          I guess the only other thing that I would add here,

8     Judge, are, other than in my submission, are just to highlight

9     that -- and it goes along with his condition with his legs.

10    The time in jail has been difficult for him.  It has been a

11    real wake-up call.  He is not 47.  I wrote that.  He is 42.

12    But he is an older defendant that has really been reflecting a

13    great deal on his conduct.

14         The government's submission makes -- and I think

15    wasn't inappropriate that I think they read my submission to

16    mean that Mr. Green, he really regrets this last robbery.  And

17    I can see where, in reading my submission, really we

18    acknowledge our responsibility for the others that we --

19         THE COURT:  Well there is no other relevant conduct

20    charge.

21         MR. DE CASTRO:  Correct.

22         THE COURT:  So I think it's -- the fact that other

23    robberies is relevant to rebut an assertion perceived or

24    otherwise that this was aberrant conduct, or this was something

25    that was just sort of a one shot out of the blue.  And I think

1    that's relevant.  But I guess it's careful not to turn that

2    into a finding of additional relevant conduct because that

3    would affect the guidelines.  Every robbery would be treated as

4    a separate -- as separate crime and a separate guidelines

5    calculation and would be grouped separately, and that would

6    have -- that would potentially make the guidelines go way up.

7    So nobody has presented any hard evidence of other crimes but

8    there seems to be a consensus or seems to be an acknowledgment

9    that this was not the only time.

10            MR. DE CASTRO:  Correct.

11            I wanted to be clear that that's not what we were

12   saying.  We weren't failing to accept responsibility for being

13   involved in what is -- was a larger conspiracy.  That's really

14   what we meant, involved in this conspiracy.  Because as the

15   Court knows, Mr. Green was employed for the last 16 years.

16   He's been an extraordinarily hard worker.  Anybody I've spoken

17   to, he works really hard.  He's done some really difficult

18   physical labor even with having, you know, missing one leg.

19   And that I just -- this was -- being involved in this

20   conspiracy was the biggest mistake of his life.  He knows that.

21   He has been really agonizing over that.  And has extraordinary

22   remorse which I will let him address the court with and I will

23   not repeat his life history that I detailed in our submission.

24            But I would like to also address one little piece

25   which is the attempted cooperation in that he -- there's an

H7S9GRE1                    Sentencing

1    additional component.  I mentioned that there has been sort of

2    a little bit of blow back on that.  There is a rumor that he is

3    a cooperating witness, he is a potential testifying cooperating

4    witness.  That's obviously not the case.  There -- his family

5    has reported from Jamaica that some people have approached

6    them.  He knew that based on his attempted cooperation that

7    that was a possibility and that was a risk and I just think the

8    court should take into consideration because it has -- really

9    having some lasting effects for him currently right now.  As of

10   last week he is hearing things.  I have been in contact with

11   the government.  So anything I hear, they are certainly taking

12   very seriously.

13          And it obviously raises a whole other issue, a whole

14   other component that if he is going to be removed from the

15   United States it creates some danger to himself, not to mention

16   his family, many of which still reside in Jamaica.

17          Other than that, Judge, I wouldn't add, unless the

18   Court has questions, I wouldn't add anything else other than

19   those facts.

20          THE COURT:  Okay.  Thank you.

21          I have a question.  It might be for both counsel.

22          At the guilty plea, when I asked Mr. Green to tell me

23   what he did that made him guilty of this crime, he indicated

24   that -- this is at the top of page 46:

25          A friend of mine called from New York, called me from

H7S9GRE1                    Sentencing

1    Boston, and asked me if I could drive up.  We rented a car.  He

2    didn't have a license.  So we drove it up there.  When I got up

3    there, the plan was to rob somebody.  And I didn't say no.  I

4    participated.  I acted along with them.

5              And when I said:  Wait.  Understanding that they were

6    going to be engaged in a robbery?

7              And he said:  First, I didn't know until I got there.

8    But once I got there, I didn't say no to them.

9              And so that was what was said.  There was sufficient

10   allocution for me to accept the plea.  But that seems to me a

11   little bit inconsistent with what's in the presentence report

12   and what's in the government's sentencing submission.  And it

13   certainly seemed to be inconsistent with the notion that there

14   were other robberies.

15             So sort of when Mr. Green knew that this was going to

16   be a robbery is I think somewhat relevant to sentencing and

17   whether or not he sort of soft pedaled or at least maybe

18   overstated his lack of knowledge when he pled guilty is also I

19   think worth knowing.

20             So I guess I want to ask each lawyer to respond to

21   that.

22             Start with the government.  Ms. Graham.

23             MS. GRAHAM:  Yes, your Honor.  If I could just confer

24   with Mr. de Castro for one moment.

25             THE COURT:  Yes.

1          (Pause)

2          MS. GRAHAM:  Your Honor, perhaps to put a helpful

3    clarification on that.  Our position, and we should have been

4    more clear about this in our sentencing letter, is that

5    certainly Mr. Green had committed prior robberies with this

6    individual and knew that he was being asked to bring a rental

7    car and construction vests up that would be used in a robbery.

8    The color is that he did not know whether he himself would be

9    actively participating in that robbery beyond that.  And so

10   that is perhaps what he meant, whether he would -- you know,

11   whether he would actually, in fact, go to the location and

12   assist in robbing the individual.

13          THE COURT:  But there were other robberies, right?

14   That's what you said in your letter.

15          MS. GRAHAM:  Yes, your Honor.

16          THE COURT:  And I don't think there's any dispute

17   about that.  So those robberies were before or after this one

18   or both?

19          MS. GRAHAM:  Those robberies were before.

20          THE COURT:  Before?

21          MS. GRAHAM:  Yes.

22          THE COURT:  So to have engaged in prior robberies and

23   then get a call to come up to Boston and say I didn't know

24   until I got there that they were going to be engaged in a

25   robbery sounds just a little misleading to me.

1          Again, it was sufficient for an allocution because he

2    acknowledged that at the time of the robbery he was in and

3    aware and agreed to participate.

4          But it creates an impression in the transcript that

5    this was something that wasn't sort of premeditated, it was

6    fairly spur of the moment, and he was an unwitting sort of tag

7    along until the moments before the decision was made to engage

8    in a robbery.  And that's hard to square, it seems to me, with

9    what's in your letter and what you've just said.

10         MS. GRAHAM:  Sure.  If it's helpful, he was made aware

11   on arriving in Boston, I believe the night before, that they

12   were going to commit a robbery the next morning.  So, he has

13   not ever claimed that it was kind of a spur of the moment, get

14   in the car and let's go.  He was very much aware of the details

15   of the plan.

16         But I understand your Honor's comments based on the

17   statement in the allocution.  Perhaps the only explanation is

18   our legal definition of participation in a robbery is bringing

19   the car here, bringing the construction vests, you're already

20   participating in that conspiracy.  I think lay people usually

21   might think of knowing about and participating in the robbery

22   as perhaps knowing the specific details and knowing that you

23   would be kind of at the scene.

24         THE COURT:  Mr. de Castro, anything you want to say?

25         MR. DE CASTRO:  So the circumstances are -- I don't

1   think that there's any real -- because in his mind it was,

2   look, I had done robberies with this person before, it's not

3   inconceivable that that's what's going on.  It could be that he

4   just needs the car and some items and they are going to do --

5   maybe give you a little bit of the background.  The Boston

6   New York connection now.  They're separated by -- he's very

7   close friends with the individual we're talking about.

8               THE COURT:  The individual we're talking about who

9   drove up to Boston?  There's two other individuals --

10              MR. DE CASTRO:  He drove up.  The coconspirator in

11  Boston.

12              THE COURT:  Okay.

13              MR. DE CASTRO:  So who had been in New York.  And they

14  were very, very close.  And lived together and things like

15  that.  And so they're friends.

16              And then he's asked to come up to Boston.

17              The likelihood is, Judge, that it would be to

18  participate in something.  He didn't know if he would be a part

19  of it or if he was just asking at that moment, just at the time

20  when he's being asked to come up to New York.

21              THE COURT:  Where were the guns?

22              MR. DE CASTRO:  I'm sorry.  Say that again.

23              THE COURT:  Where were the guns?

24              MR. DE CASTRO:  In Boston.

25              THE COURT:  The guns were not in the car?

1            MR. DE CASTRO:  No.

2            THE COURT:  They were in Boston.

3        And then what the government wrote on the first page

4    of its letter is that defendant and his codefendant, Cleon

5    Clarke, were recruited to commit this robbery by a

6    coconspirator, CC1, who asked them to travel from the Bronx to

7    Massachusetts to help CC1 with a robbery.

8            That implies that he was recruited before he came up.

9            In furtherance of the robbery, the defendant brought a

10   rental car up from the Bronx as well as construction vests so

11   that if the men were stopped in the course of the robbery they

12   would appear to have a legitimate purpose for being in the

13   area.

14           All of this implies that this was discussed before he

15   got to Boston -- or Massachusetts, maybe not Boston.

16           MR. DE CASTRO:  Our position has always been, even in

17   our proffer sessions with the government, that it was not

18   discussed with Garfield Green prior to him getting up to

19   Boston.  It could have been -- one issue is I don't know

20   actually -- I know I said that he did not bring the guns up to

21   Massachusetts.  If Mr. Clarke had a gun, he did not know it.

22   He did not have knowledge of it.

23           When they got to Boston it wasn't, as the government

24   said, like:  Okay, jump in the car, we're going to do this.  It

25   was discussed and details were described and they were talked

H7S9GRE1                    Sentencing

1    about and planned.  It was not that -- all I'm saying is that

2    from Mr. Green's perspective he was asked to come up, bring

3    this.  In his mind it was:  Okay, we're probably going to be

4    doing some crime, maybe a robbery.  I don't know if I'm going

5    to be cut into it, asked to participate in it, or if I'll have

6    that opportunity or not.  When he gets to Boston, then it's

7    clearly discussed with him and he agrees to do it.  There is no

8    issue.

9            THE COURT:  But bringing construction vests so if

10   they're stopped they have a plausible story for being in the

11   area.  These construction vests were brought from New York?

12           MR. DE CASTRO:  Yes.

13           THE COURT:  So.

14           MR. DE CASTRO:  That's why I said he knows that

15   there's a probability that that's what's happening up there.

16   Whether he's going to be participating in it, he doesn't know

17   until he gets there, discusses it with him, they are saying --

18   coconspirator one, who is the leader is saying:  Yes, you're in

19   essentially.  Okay.

20           So he didn't -- Mr. Green is just telling you what he

21   remembers.  He's not minimizing his involvement at all from --

22   he knew the details.  He knew the plan.  He knew everything

23   that was going to happen.  All Mr. Green was saying when he

24   said to the government is that he learned it when he got to

25   Boston.

H7S9GRE1                    Sentencing

1          And I think that makes sense.  I don't think that

2    people are necessarily going to talk about it openly.  I know

3    I've had plenty of cases where people do.  But sometimes people

4    are cautious and aren't going to say here's our plan on a phone

5    that of course could be recorded or intercepted in some sort of

6    way.

7          So he gets there.  He runs details, and he's a willing

8    participant.  An he commits the crime.  No question.

9          THE COURT:  Right.  I think that's hard to square with

10   the comments -- the statements made at the guilty plea.

11          And the attempts to cooperate were before the guilty

12   plea or after the guilty plea?

13          MR. DE CASTRO:  Before.

14          THE COURT:  Before.

15          All right.  Ms. Graham, anything else you'd like to

16   say?

17          MS. GRAHAM:  Your Honor, we highlighted the serious

18   nature of the crime in our sentencing submission.  We'd rest on

19   that but are happy to answer any further questions.

20          THE COURT:  I wasn't sure I understood what the

21   government's position is here.  What you respectfully submitted

22   is that a significant incarceratory sentence such as a sentence

23   within the stipulated sentencing guidelines would be sufficient

24   but not greater.

25          So are you asking for a guidelines sentence or are you

H7S9GRE1                    Sentencing

1    just telling me that a guidelines sentence would be one of a

2    range of sentences that would be sufficient.

3              MS. GRAHAM:  Yes, your Honor.  We're asking for a

4    guideline sentence.

5              THE COURT:  You're asking for a guideline sentence?

6              MS. GRAHAM:  Yes, your Honor.

7              THE COURT:  That's not the normal -- this doesn't

8    appear to be the standard language for a guideline sentence.

9              So you're asking for a sentence within the range of 57

10   to 71 months.

11             MS. GRAHAM:  Yes, your Honor.

12             THE COURT:  And that's because why.

13             MS. GRAHAM:  It's because of the serious nature of the

14   crime.  This was a planned, premeditated crime in which an

15   innocent civilian was robbed at gunpoint in an event that was

16   very traumatizing to him.

17             Also, as we noted, and in response to defense's

18   submission, solely as a 3553(a) factor, going to the

19   defendant's history and characteristics, we noted the prior

20   robberies that he had been involved in, with some same

21   individuals.  We think that a significant sentence, a guideline

22   sentence, is appropriate here.

23             THE COURT:  Okay.  Thank you.

24             Is there anything else you would like to say,

25   Mr. de Castro?

H7S9GRE1                    Sentencing

1          MR. DE CASTRO:  No, Judge.  Thank you.

2          THE COURT:  So as I said then, Mr. Green, you have a

3   right to address the court.  It looks like you have something

4   that you wanted to read from.  You can stay seated.  Just maybe

5   pull the microphone down a bit so it's closer to your mouth.

6          THE DEFENDANT:  My name is Garfield Green and I'm

7   writing this letter to ask for leniency from the judge and the

8   people I offended, the victims I offended, their families.  I

9   wake up everyday -- I wake up everyday and ask myself why did I

10  make this wrong decision.  Couldn't I just leave?

11         I'm sorry.

12         That would have been the right move to make.  Instead

13  I listened to a friend, someone that I thought was family, and

14  I went along.  I can tell you this is honestly the most --

15         THE COURT:  Take your time.  Take your time.

16         Do you need a glass of water or something?  I can get

17  you a bottle of water.  Do you want to do that?

18         Take your time.  Look, this is a big day for you.

19  It's an emotional time.  I understand that.  It's a difficult

20  thing to speak in court.  So just catch your breath.  We're in

21  no rush.  I'll get you a drink of water.  Use a tissue if you

22  need.  Because I want to make sure I can hear what you're

23  saying.

24         THE DEFENDANT:  I can tell you honestly this was the

25  biggest mistake of my life.  I feel like such a fool.

1          Your Honor, at this point in my life I had everything

2     a man could want:  A good job, just purchased a house,

3     beautiful wife, a beautiful family that loves me a lot, and I

4     am on the verge of losing the one thing that I care about more

5     than anything in the world, my family.

6          I would like the chance to be there for my son who was

7     recently born who I haven't seen yet.  I would like the chance

8     to see my daughter and figure out a way to explain to her where

9     I've been and what I've been -- and without being able -- if

10    somebody was to teach me, to explain to me what I'm doing, the

11    effect it would have on friends and family, this would have

12    never happened.  I'm 42 years old.  I did a lot of stupid

13    things in life.  But, your Honor, this is the biggest one I've

14    ever made in my life, for the people I've hurt, being in

15    prison, it's not half of what they've been going through in

16    their life.  And for this I'm deeply sorry.  And I promise to

17    this court, to the people I hurt, and my family and friends,

18    this will never, ever happen again.  Please forgive me.  Thank

19    you.

20         THE COURT:  Okay.  All right.  Let's do this.  Let's

21    take a minute because I want to make sure that Mr. Green has an

22    opportunity to collect himself.  It is, as I said, an emotional

23    moment.  It often is.

24         One question I have -- so we'll take maybe a five or a

25    ten minute break so I can collect my thoughts and, Mr. Green,

you can catch your breath and so that way you'll be able to be

focused when I state the sentence and explain my reasons for

it, okay.

One question I did have for the government that I

meant to ask.  So I've got two defendants and a coconspirator

who has not been charged as far as I know and I'm trying to get

a sense of relative culpability.  I'll be sentencing

Mr. Clarke.

That was one change I guess that I would make in the

presentence report, the presentence report indicates that

Mr. Clarke would be sentenced on July 6.  That sentencing date

was moved to August 30.  So he has not yet been sentenced.

But I guess I would like to have a sense of the

government's view as to the relative culpability of those two

defendants.  Are they equal?  I don't know that a driver is

less culpable than a person who is carrying the gun when

they're all in it together and they all share proceeds.

But was there a distinction between who got paid what?

Was there a difference in role?  Was there a difference in

knowledge, culpability, things like that?

MS. GRAHAM:  Yes, your Honor.  Certainly the

coconspirator in this case, CC1 in our sentencing submission,

we believe was the most culpable.  CC1 was the organizer who

really did the surveillance in advance, determined the daily

plan, called Mr. Clarke and Mr. Green and asked --

1          THE COURT:  Right.  So he would be subject to a higher

2     guidelines range because he'd be getting leadership or

3     organizer points.

4          MS. GRAHAM:  Yes, your Honor.

5          THE COURT:  But he's not charged, as far as I know.

6          MS. GRAHAM:  He is not charged in this case, your

7     Honor.

8          THE COURT:  Is he charged in some other case?

9          MS. GRAHAM:  Yes, your Honor.

10          THE COURT:  And then there's Mr. Clarke, who I know a

11     little more about because I took his guilty plea, and I will be

12     sentencing him in about a month.  So relative to Mr. Clarke,

13     how does Mr. Green fit?

14          MS. GRAHAM:  Mr. Clarke -- we believe that Mr. Clarke

15     is also more responsible than Mr. Green.  Not necessarily as a

16     leader but as someone who is certainly more active in this

17     robbery as someone who carried a firearm and as someone who --

18          THE COURT:  That's my question.  The law doesn't

19     usually make a distinction -- you've got three people.  One is

20     driving the car.  The other two are doing the robbery with the

21     guns.  You don't usually get points off for being just the

22     driver, right?  Everybody is in it together and that's

23     understood.

24          So it requires, I suppose, a little more nerve to be

25     the person who's got the gun.  There might be some people who

H7S9GRE1                    Sentencing

1    say:  Well, I'll drive but I won't carry the gun.  I'm not sure

2    I would consider that to be tremendously significant.

3            But is there a difference in terms of knowledge or

4    planning or role or percentage of the proceeds, things like

5    that?

6            MS. GRAHAM:  Certainly CC1 did get more of the

7    proceeds.

8            THE COURT:  I'm really focused on Clarke.

9            MS. GRAHAM:  Of course, your Honor.  I understand your

10   point that certainly every person is instrumental, including

11   the driver.

12           I would point out in terms of that, I think that many

13   people when planning the roles of a robbery, certainly the

14   people planning it may think that the person carrying the gun

15   is a more active participant than the driver; and to that

16   effect, Mr. Green was usually the driver in the other

17   robberies.  He did not carry a gun in those other robberies.

18           So in terms of who was more instrumental, I certainly

19   appreciate your Honor's point and appreciate it from a

20   guidelines perspective.  Perhaps from a lay person's

21   perspective, there is a sense that the driver is not less

22   culpable or less instrumental but perhaps a less aggressive

23   part of the given robbery.

24           Our understanding is that they received roughly

25   similar proceeds from the robbery.

1          THE COURT:  So let's take a short break and we'll come

2     back in about five or ten minutes.  Okay.

3          Mr. Green, I don't want to prolong this, but I do want

4     to have a chance to collect my thoughts, to think about what

5     you've said, to think about what the lawyers have said.

6          I always come into a sentence prepared.  So I've read

7     everything and I've thought about this for a long time as to

8     what would be an appropriate sentence.  But I always want to

9     make sure that I'm open to hearing things that might move me

10     one way or the other and that's, I think, important because

11     otherwise what would be the point of hearing from the lawyers

12     or hearing from the defendant.  So I always want to remain open

13     minded and then have a minute at least or a few minutes to

14     reflect on what I've heard.  Okay.

15          So we'll pick up again in a few minutes.

16          (Recess)

17          THE COURT:  Thank you.  Have a seat.

18          Thank you.

19          I understand that there's some family members of

20     Mr. Green have arrived.

21          MR. DE CASTRO:  Yes.  They got here actually part of

22     last session, but I closed the door.  We were talking about

23     some sensitive issues so his wife stayed outside.

24          THE COURT:  We're not allowed to close doors unless

25     there is a court order.

1      MR. DE CASTRO:  Just the outside door was closed

2  because we heard a lot of noise.

3      THE COURT:  So who is here?

4      MR. DE CASTRO:  His wife and his nephew.

5      THE COURT:  Thank you for being here.  Please have a

6  seat.

7      I'll tell you what you've missed, because I think

8  obviously this sentencing affects you as much as anyone.  So

9  we've gone through the sentencing guidelines which are part of

10  sentencing.  It's a big book that, at the risk of repeating

11  myself, I'll just say is put out by a commission.  And judges

12  like me have to follow -- not follow, but consider the book.

13  And so for every crime the judge makes a calculation and

14  determines what the commission that prepares this book believes

15  to be an appropriate sentence.  In this case, the sentence that

16  is called for by the guidelines book is 57 to 71 months, so a

17  little less than five to a little less than six years.

18      There are other factors also that I have to consider

19  that include Mr. Green's personal history, that include the

20  facts and circumstances of the crime, that include the need to

21  deter criminal conduct, that include considering Mr. Green's

22  special needs to the extent he has needs that have to be

23  addressed in prison, and also the need to avoid disparities

24  between defendants who are similar.  It's important that there

25  be some consistency.

1          So I want to make sure that you're aware of what goes

2     on here because, as I said, it's important that this sentencing

3     take into account how the sentence will impact you and the

4     kids, because that's a sad fact.  I mean the reality is that

5     many defendants have children, and children are affected by

6     these sentences.  And it's not fair because they're innocent

7     victims.  And most of them can't understand what's going on.

8     Certainly the kids here don't understand what's going on.  But

9     certainly your daughter understands that she's missing her

10    father and that's a real hardship.  That's a real suffering.

11         So I say it not because it's unusual.  It's all too

12    usual.  I say it because it should be said.  It should be

13    acknowledged that this sentence will affect them.  It's not

14    something that I don't consider.  It's not something that I

15    think is insignificant.  I think it's very significant.  It's

16    just, unfortunately, a fact of life.  Individuals are connected

17    to other individuals.  Defendants have families and children

18    and people who rely on them and people who suffer as a result

19    of the punishment that requires them to be separated.  And I

20    wish there was something I could do to make that not the case

21    but that, sadly, is just the reality.  So I want you to just

22    know I'm aware of it.

23         I want to thank you for writing letters.  Letters like

24    the ones you wrote are very helpful to give me a sense of the

25    person I'm sentencing.  I don't know Mr. Green well.  I have

1    seen him a couple of times here in court.  I've read about him.

2    I've read the presentence report that includes a lot of

3    information, some of it based on interviews and conversations

4    with family members and friends and coworkers.  And then I've

5    read letters like the ones that were submitted by

6    Mr. de Castro, who is a very fine lawyer and very thorough

7    lawyer.  So he's always careful to provide a full picture of

8    the defendant.  And I think one of the things that was said in

9    the letter -- in the letters a few times by various people was

10   the hope that my sentence would consider the whole person, not

11   just this crime, but the whole person.  And that's a fair hope.

12   I mean I think that's a reasonable request.  And that's part of

13   it.  I have to consider the whole person.  I'm not sentencing

14   just one act.  I'm sentencing the person, recognizing that

15   everybody is complicated.  Everybody has contactor traits that

16   are admirable and some that are less admirable.  People make

17   mistakes but that doesn't mean they're not capable of great

18   kindness and great charity and great love.  And I think it's a

19   testament to Mr. Green that people were willing to speak about

20   that in letters.

21          So my role now is to impose a sentence and Mr. Green.

22   I think has been waiting a while and he's probably anxious to

23   get this going because it's not fun to live in suspense as to

24   what the sentence will be.  I understand that.  But I have to

25   give my reasons.  Because in our system judges have to give

H7S9GRE1                    Sentencing

1     reasons.  They don't just impose a sentence and storm off.

2     They have to explain it in the hope that it will make sense to

3     a defendant, that it will make sense to the defendant's family

4     and to the larger community, it make sense to the public.

5     And so we do it here in open court on the record.  There's a

6     transcript that anybody could look at.  So it's important that

7     we do it carefully and honestly and transparently.  So that's

8     why we do it this way.

9          So I always begin and I usually begin with

10    acknowledging the humanity of the person.  Mr. Green is -- I

11    think is a good person.  I don't think there's any way I could

12    disagree with that.  The letters say that.  His remorse, his

13    remarks today, which were spoken through choked tears and was

14    obviously very emotional, I think reflect that this is a guy

15    who has good qualities and is -- has lived in many ways an

16    admirable life.  He's worked very hard.  He's raised a family.

17    He's been a good spouse.  He's been a good friend.  He's a kind

18    and generous person who has made a difference in the lives of

19    people around him.  That's reflected in the letters.  And I

20    credit that.

21         And that's not true with everybody.  There are a lot

22    of defendants who don't have that kind of support or they don't

23    include letters that give me those sorts of insights into their

24    character.  So that's a good thing.  That's to your credit.

25         At the same time I have to think about the details of

1   this crime.  And this is a crime that is I mean just so awful.

2   It's a crime that involved traveling out of state to go from

3   New York to Massachusetts, to work with other people to rob an

4   armored car, an armored car carrying cash that was going to

5   fill ATMs.  And the plan was to basically rob the guy driving

6   the truck at gunpoint.  That's what happened.  Not Mr. Green

7   but his two coconspirators got out of his car, the car he was

8   driving, with guns, approached the driver of the armored car,

9   put a gun to his head, basically ordered him into the back of

10  that car obviously with the implicit threat that if he didn't

11  comply he would be killed.  And then money was stolen from the

12  truck that amounted to $250,000.  That was a broad daylight,

13  armed robbery that involved potential for death.  No question

14  about it.  If an undercover cop had come upon the scene and

15  decided I'm going to stop this in its tracks, or if the armed

16  armored car driver decided to resist or decided that he could

17  get out of this, who knows what could have happened.  Somebody

18  could have gotten killed.  That's what happens with guns.  An

19  innocent bystander, a small child, the armored car driver,

20  anybody could have been killed.

21          And so that's -- that's about as bad as it comes.  And

22  that's a crime that has to be punished.  And it's also worth

23  considering that the punishment contemplated here for the

24  robbery would normally be enhanced by the imposition of a

25  mandatory consecutive sentence because Congress has said gun

1    crimes are so bad that they have to be punished extra.  And so

2    they've written a law that says somebody who commits a crime of

3    violence like this robbery with a gun in which the gun is

4    brandished, pointed at somebody, put against their head, well

5    that's going to carry extra penalties and, according to the

6    law, there would be an extra penalty of seven years on top of

7    whatever sentence I impose on the robbery.

8         Now, Mr. Green was charged with that crime.  He

9    ultimately, as part of a plea deal with the government that was

10   accepted by me, he didn't plead to that and that -- the

11   government has agreed to dismiss that count.  But that's a

12   savings of seven years off the top.  If the case had gone to

13   trial or if the government had not been willing to come off of

14   that count, then we'd be talking about a much higher guideline

15   sentence than what we're talking about here.  And so I just

16   think that that's also worth considering, that this plea deal

17   does carry within it significant benefits that have already

18   been realized.

19        I also have to say that I can't ignore the fact that

20   this is not an isolated incident.  If this were the first time

21   and the only time that Mr. Green was ever involved in something

22   like this, then I might be inclined to go below the guidelines.

23   But where it was -- it's been reported and not disputed that

24   there were multiple other incidents like this -- I don't know

25   the details, I'm not considering them as relevant conduct, but

1   I think they certainly are relevant to whether or not this is

2   aberrant conduct or something that is isolated to the point

3   where there should be a below guidelines sentence.  I think

4   that's a fair consideration.  And the fact that there were

5   multiple other incidents suggests to me a below guideline

6   sentence is not appropriate.

7           Now Mr. Green has worked his whole life.  That's not

8   true of every defendant.  That's admirable.

9           I got a letter from one of your coworkers who speaks

10  about your being a colleague and a stand-up guy and a hard

11  worker.  Your wife says the same thing, talks about the work

12  that you've done for free and your commitment to being a good

13  employee and a good worker.  And that is really admirable.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  You are a union member.  You were making a

2    decent living.

3          And that's another thing I just don't understand here.

4    According to the presentence report, your household income,

5    that's between what you were making and what I guess your wife

6    was making, was about $180,000 a year in recent years.  That's

7    a good living.  People who make that kind of money coming in

8    don't entertain getting involved in armed robberies.  So I

9    don't understand it.  That's basically as much as I make.

10         And I don't fully understand the relationship between

11   you and Mr. Clarke and you and the other individual who is

12   identified as Co-Conspirator 1.  That's part of it, I'm sure.

13   Those relationships were part of what induced you to get

14   involved here.

15         But you knew better.  You know better.  You're better

16   than this.  You're smarter than this.  To do this not once, but

17   multiple times, you had to have known that getting caught would

18   result in years in jail.  You had to have understood that.

19         My heart breaks for your family because they deserve

20   better, and they're suffering.  But the reality is, I mean,

21   people with young families, people who depend on them, that

22   alone is enough to prevent them from getting involved in crimes

23   like this.  The thought of an arrest and a separation are

24   enough to make people who care about their families not get

25   involved in this kind of conduct.

1      So again, I'm sympathetic to your family and I'm

2   impressed with your commitment to them, and your being a good

3   father and a good spouse.  But, it is inexplicable how you

4   could jeopardize all that to participate in this crime and

5   others like it.

6      So, the bottom line, where do I come out, what is an

7   appropriate sentence.  I've thought about this for days, for

8   weeks.  I've really thought about this a long time.  I look at

9   these photos of your family, I read these letters.

10      But I also then come back to reading about the crime

11   and reading about the victim and reading about the guns and

12   what could have happened.  And I just have to say that I think

13   a sentence of anything less than five years is just not

14   appropriate.  That's as low as I can go in good conscience.

15   Because it is an unspeakably violent crime and it was not

16   isolated.

17      That's the sentence I intend to impose.  A term of

18   incarceration of five years with credit for time you've already

19   served, to be followed by a term of supervised release with

20   conditions that are set forth in the presentence report.

21      I'm also going to order restitution in the amount of

22   $252,000 to the victims of this crime as well as forfeiture in

23   the same amount.  I'm not going to impose a fine.  I will

24   impose a $100 special assessment.

25      That's the sentence I intend to impose.  Is there any

1  legal impediment to my imposing that sentence?

2          MS. GRAHAM:  I didn't hear the number of years of

3  supervised release.

4          THE COURT:  I'm sorry.  Three years of supervised

5  release, which is the maximum.

6          MS. GRAHAM:  Thank you.

7          THE COURT:  Okay.

8          MR. DE CASTRO:  No legal impediment, Judge.

9          THE COURT:  So, you can remain seated.  I'm now going

10  to formally impose the sentence.

11          I'm sentencing you, Mr. Green, to a term of

12  imprisonment of five years with credit for the time you've

13  already served, to be followed by a term of supervised release

14  of three years with the following mandatory, standard and

15  special conditions.

16          The mandatory conditions are that you will not commit

17  another federal, state or local crime of any kind.  That you

18  will not possess a firearm of any kind or a destructive device.

19  You cannot do that.  That's a crime if you were to possess a

20  firearm.  You may not use or possess an illegal substance.  A

21  controlled substance or prescription drugs for which you don't

22  have a prescription.

23          You will report to probation, you will also provide

24  DNA as requested by law enforcement, and you'll also comply

25  with any conditions and requirements of immigration officials,

1    since it is possible you could be deported.  I don't know, but

2    it's certainly possible.

3           In addition, there are standard conditions that are

4    imposed in virtually every case, there are 13 in all.  I impose

5    those here along with the following special conditions.

6           You will report to probation within 24 hours of your

7    release from custody.  The only exception is if you get out on

8    a Friday or weekend, or the night before a holiday, then you

9    can report the next business day.  You'll be supervised in the

10   district of residence, which I assume that will be the Bronx.

11   Is that where you're planning to live?  Or Upstate.  Florida,

12   New York.

13          In addition, in the event that the probation officer

14   believes there is evidence of a crime or evidence of a

15   violation of supervised release, you have to then allow for a

16   search of your premises, any apartment that you're living in,

17   any premises you control.  Your work space, car, electronic

18   devices, you have to allow those to be searched in the event

19   that the probation officer believes there is evidence of a

20   crime or evidence of a violation of supervised release.  You

21   also have an obligation to let the people with whom you reside,

22   any adults, you have to let them know you're subject to that

23   search requirement.

24          You may not open lines of credit, you can't take out

25   mortgages or take out a bank loan, open a credit card account,

1    without the permission of the probation officer, and you also

2    have an obligation to provide truthful information about your

3    economic activity, your income, your spending.

4            In addition, as I said, I'm not going to impose a

5    fine.  I will order restitution in the amount of $252,000 to

6    the victims who are set forth on the restitution order.

7    They'll also be set forth on a sealed page on the judgment.  It

8    is the victims of this crime.  And then there will be

9    forfeiture in the amount of $252,000, that's joint and several

10   for the crime that was committed here with two co-conspirators.

11   But basically, if you pay the restitution, that will pay down

12   the forfeiture.  You'll get credit for that, but there will be

13   interest on that.

14           I'm not going to impose a fine but I will impose a

15   $100 special assessment.

16           I should tell you that you have a right to appeal this

17   sentence.  It may be that your plea agreement waived that

18   right.  I think it did, because I sentenced you within the

19   range that you agreed to, and as a result, you agreed you

20   wouldn't appeal or otherwise challenge that sentence.  But, if

21   you think you have a basis to appeal and you wish to do so, you

22   have to file a notice of appeal within two weeks.  So talk to

23   Mr. De Castro about that.  He'll help you file a notice of

24   appeal if that's something you want to do.

25           There are open counts that you wish to move for

1    dismissal?

2            MS. GRAHAM:  Yes, your Honor.  We move to dismiss open

3    counts at this point.

4            THE COURT:  So I will dismiss the open counts which

5    are Counts One and Three of the indictment.

6            Is there anything else we should cover today, Mr. De

7    Castro?

8            MR. DE CASTRO:  Just the recommendation, Judge, he be

9    housed as close as possible to Florida, New York, should the

10   BOP --

11           THE COURT:  I assume Otisville is probably the

12   closest.  I'm happy to make that recommendation.  Obviously,

13   Mr. Green has some medical issues that would need to be

14   addressed, but I think probably Otisville is capable of

15   addressing those concerns.

16           So I'll make the recommendation for Otisville.  It is

17   important that you be close to your family.  I can't order

18   that, but I'll recommend it in the strongest possible terms.

19           So Mr. Green, it's a tough sentence and I understand

20   that.  And it's very tough on your family and my heart goes out

21   to them.  I've explained my reasons and people can disagree.  I

22   respect that.  At the very least, I hope you and your family

23   leave here believing at least it was a careful system.  It was

24   a fair system.  It was one that tried to be respectful of

25   everybody.  And that's what I've certainly endeavored to do.

1          I meant what I said.  I think you are a good man.  You

2     are a young man, too, so you've got a lot left in your life.

3     You've got to serve this time.  You've got to be punished for a

4     serious crime.  But, this crime doesn't define you.  There is

5     more to you than this.  And I think you have the rest of your

6     life to demonstrate that for your sake, for the sake of your

7     family, and I hope you'll do that, because you deserve it.  You

8     deserve a life that's long and happy and healthy.  That you're

9     there to provide for your family.  So I hope you'll do that.  I

10    hope your family will continue to support you.  It is really

11    important that they be there for you.

12         I hope you'll continue to support your kids.  This can

13    be a very difficult time for them.  So do everything you can to

14    be there for them as a father.

15         Was there something else you wanted to say?

16         MR. DE CASTRO:  One thing, Judge, I wanted to address

17    what may be a request for a temporary sealing on the aspects of

18    this proceeding that addressed his attempt at cooperation.

19         THE COURT:  So the transcript?

20         MR. DE CASTRO:  And my original submission which I

21    didn't do on the docket.

22         THE COURT:  So why don't you order a copy of the

23    transcript, you and the government, review the transcript.  If

24    you have redactions that you think would be appropriate in

25    light of discussions of cooperation, you can send that to me.

H7S3GRE2                    Sentencing

1    If I give you two weeks, is that sufficient?

2              MR. DE CASTRO:  That's fine.

3              THE COURT:  And once I see what you've proposed, I'll

4    then make a determination as to whether the redactions are

5    appropriate.  I'll issue an order.  And I think I'll seal the

6    other submission that you sent to me which talks about

7    cooperation.

8              MR. DE CASTRO:  Right.

9              THE COURT:  But there is already a docketed version of

10   a sentencing submission that doesn't talk about cooperation.

11             MR. DE CASTRO:  Okay.  Thank you, Judge.

12             THE COURT:  Two weeks.  And then run it by Ms. Graham

13   before you send it to me.  Hopefully it will be on consent.

14             MS. GRAHAM:  If we could also just seal my original

15   sentencing submission.  Again, there is a redacted one filed on

16   ECF.

17             THE COURT:  There is a presumption of open records,

18   Mr. Green, and that means, generally speaking, anybody can come

19   into this courthouse and watch a proceeding.  And anybody can

20   get access to a transcript of what took place in a courtroom.

21   However, there are situations where it is appropriate to seal

22   things.  So if there is references to cooperation, that can

23   sometimes pose a risk to safety.

24             And so, given what's been represented here, I think

25   the presumption of open records has been overcome by the need

1   to ensure your safety and the safety of people close to you,

2   and not to disclose your attempts to cooperate.  If there are

3   future attempts at cooperation, then that obviously would be

4   the subject of a Rule 35, and that's always an option.

5            But for now, that's the sentence of the Court.  Good

6   luck to you and to your family.  Thanks very much.

7            And let me thank the court reporter.  Let me thank the

8   marshals as well.  Have a good day.

9            (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25